**LeClairRyan**
*A Professional Corporation*
One Riverfront Plaza
1037 Raymond Boulevard
Newark, New Jersey 07102
(973) 491-3600
Attorneys for Plaintiff, Ramada Worldwide Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RAMADA WORLDWIDE INC., a Delaware Corporation, | : |
| | : |
| Plaintiff, | :     Civil Action No. 15- |
| v. | : |
| | : |
| AKSHAY HOTELS, INC., a Florida Corporation; KHALIL NANITALWALA, an individual; and SHAHZAD HAQUE, an individual, | :     **VERIFIED COMPLAINT** |
| | : |
| Defendants. | : |
| | : |

Plaintiff Ramada Worldwide Inc., by its attorneys, LeClairRyan, complaining of defendants Akshay Hotels, Inc., Khalil Nanitalwala and Shahzad Haque, says:

### PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Ramada Worldwide Inc. ("RWI") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

2.      Defendant Akshay Hotels, Inc. ("Akshay"), on information and belief, is a corporation organized and existing under the laws of the State of Florida, with its principal place of business at 2145 East Irlo Bronson Memorial Highway, Kissimmee, Florida 34744.

3.      Defendant Khalil Nanitalwala ("Nanitalwala"), on information and belief, is a principal of Akshay and a citizen of the State of Florida, residing at 2145 East Irlo Bronson Memorial Highway, Kissimmee, Florida 34744.

4.      Defendant Shahzad Haque ("Haque"), on information and belief, is a principal of Akshay and a citizen of the State of Florida, residing at 2145 East Irlo Bronson Memorial Highway, Kissimmee, Florida 34744.

5.      The amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 & 1338, 15 U.S.C. § 1121 and, with respect to certain claims, 28 U.S.C. § 1367.

7.      This Court has personal jurisdiction Akshay by virtue of, among other things, section 17.6.3 of the September 28, 2006 license agreement by and between Akshay and RWI (the "License Agreement"), described in more detail below, pursuant to which Akshay has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

8.      This Court has personal jurisdiction over Nanitalwala and Haque by virtue of, among other things, the terms of a guaranty (the "Guaranty"), described in more detail below, pursuant to which Nanitalwala and Haque acknowledged that they were personally bound by section 17 of the License Agreement.

9.      Venue is proper in this District pursuant to section 17.6.3 of the License Agreement, inasmuch as that provision contains an express waiver by Akshay of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Ramada® Marks

10.     RWI is one of the largest guest lodging facility franchise systems in the United States, and is widely known as a provider of guest lodging facility services.

11.     RWI owns and has the exclusive right to license the use of the service mark RAMADA and various related trade names, trademarks and service marks (certain of which are on the principal register of the United States Patent and Trademark Office), logos, and derivations thereof (the "Ramada® Marks"), as well as the distinctive Ramada® System, which provides guest lodging services to the public under the Ramada® name and certain services to its licensees, including a centralized reservation system, advertising, publicity, and training services.

12.     RWI or its predecessors first used the RAMADA mark in 1970 and the Ramada® Marks are in full force and effect.  Certain of the registered Ramada® Marks are incontestable pursuant to 15 U.S.C. § 1065.

3

13.     RWI has given notice to the public of the registration of the Ramada® Marks as provided in 15 U.S.C. § 1111.

14.     RWI uses or has used the words "Ramada," among others, as abbreviations of its brand name.

15.     Through its franchise system, RWI markets, promotes, and provides services to its guest lodging licensees throughout the United States.  In order to identify the origin of their guest lodging services, RWI allows its licensees to utilize the Ramada® Marks and to promote the Ramada® brand name.

16.     RWI has invested substantial effort over a long period of time, including the expenditure of millions of dollars, to develop goodwill in its trade names and service marks to cause consumers throughout the United States to recognize the Ramada® Marks as distinctly designating RWI guest lodging services as originating with RWI.

17.     The value of the goodwill developed in the Ramada® Marks does not admit of precise monetary calculation, but because RWI is one of the largest guest lodging facility franchise systems in the United States and is widely known as a provider of guest lodging facility services, the value of RWI's goodwill exceeds hundreds of millions of dollars.

18.     The Ramada® Marks are indisputably among the most famous in the United States.

## The Agreements Between The Parties

19.     On or about September 28, 2006, RWI entered into the License Agreement with Akshay for the operation of a 146-room Ramada® guest lodging facility located at 2145 East Irlo Bronson Memorial Highway, designated as Site No. 18310-68093-01 (the "Facility").  A true copy of the License Agreement is attached hereto as Exhibit A.

20.     Pursuant to section 5 of the License Agreement, Akshay was obligated to operate a Ramada® guest lodging facility for a fifteen-year term, during which time Akshay was permitted to use the Ramada® Marks in association with the operation and use of the Facility as part of RWI's franchise system.

21.     Pursuant to section 3 of the License Agreement, Akshay was required, among other things, to make renovations to the Facility, in order to bring the Facility into compliance with "System Standards," "Approved Plans," and/or a "Punch List," all of which were defined in or attached to the License Agreement, and to achieve and maintain certain scores on periodic quality assurance inspections conducted by RWI.

22.     Pursuant to section 3.4 of the License Agreement, Akshay was required to operate the Facility in compliance with RWI's "System Standards," as defined in the License Agreement, including RWI's quality assurance requirements.

23.     Pursuant to section 4.8 of the License Agreement, RWI had the right to conduct unlimited quality assurance inspections of the Facility (and unlimited reinspections if the Facility received a failing score in the inspection) to determine whether the Facility was in compliance with RWI's quality assurance requirements.

24.     Pursuant to section 7, section 18.3 and Schedule C of the License Agreement, Akshay w as required to make certain periodic payments to RWI for royalties, service assessments, taxes, interest, reservation system user fees, and other fees (collectively, "Recurring Fees").

25.     Pursuant to section 7.3 of the License Agreement, Akshay agreed that interest is payable "on any past due amount payable to [RWI] under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

26.     Pursuant to section 3.8 of the License Agreement, Akshay was required to prepare and submit monthly reports to RWI disclosing, among other things, the amount of gross room revenue earned by Akshay at the Facility in the preceding month for purposes of establishing the amount of royalties and other Recurring Fees due to RWI.

27.     Pursuant to section 3.8 of the License Agreement, Akshay agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.8 and 4.8 of the License Agreement, Akshay agreed to allow RWI to examine, audit, and make copies of the entries in these books, records, and accounts.

28.     Pursuant to section 11.2 of the License Agreement, RWI could terminate the License Agreement, with notice to Akshay, for various reasons, including Akshay's (a) failure to pay any amount due RWI under the License Agreement, (b) failure to remedy any other default of its obligations or warranties under the License Agreement within 30 days after

receipt of written notice from RWI specifying one or more defaults under the License Agreement, and/or (c) receipt of two or more notices of default under the License Agreement in any one year period, whether or not the defaults were cured.

29.     Pursuant to sections 12.1 and 18.4 of the License Agreement, Akshay agreed that, in the event of a termination of the License Agreement pursuant to section 11.2, it would pay liquidated damages to RWI in accordance with a formula specified in the License Agreement.

30.     Section 13 of the License Agreement specified Akshay's obligations in the event of a termination of the License Agreement, including its obligation to immediately cease using all of the Ramada® Marks.

31.     Pursuant to section 17.4 of the License Agreement, Akshay agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [License] Agreement or collect amounts owed under this [License] Agreement."

32.     Effective as of the date of the License Agreement, Nanitalwala and Haque provided RWI with a Guaranty of Akshay's obligations under the License Agreement.  A true copy of the Guaranty is attached hereto as Exhibit B.

33.     Pursuant to the terms of the Guaranty, Nanitalwala and Haque agreed, among other things, that upon a default under the License Agreement, they would "immediately make each payment and perform or cause [Akshay] to perform, each unpaid or unperformed obligation of [Akshay] under the Agreement."

34.     Pursuant to the terms of the Guaranty, Nanitalwala and Haque agreed to pay the costs, including reasonable attorneys' fees, incurred by RWI in enforcing its rights or remedies under the Guaranty or the License Agreement.

**The Defendants' Defaults and Termination**

35.     Beginning in 2013, Akshay repeatedly failed to operate the Facility in accordance with RWI's System Standards, in breach of its obligations under the License Agreement.

36.     On March 28, 2013, RWI conducted a quality assurance ("QA") inspection of the Facility.  By letter dated  April 3, 2013, a true copy of which is attached hereto as Exhibit C, RWI advised Akshay that (a) the Facility received a failing score in the QA inspection and, as a result, Akshay was in default of its obligations under the License Agreement, (b) pursuant to the License Agreement, it had 90 days within which to cure the QA default, and (c) if the default was not cured, then reservation service to the Facility might be suspended and the License Agreement might be subject to termination.

37.     On August 5, 2013, RWI conducted another QA inspection of the Facility. By letter dated  August 14, 2013, a true copy of which is attached hereto as Exhibit D, RWI advised Akshay that (a) the Facility received a failing score in the QA inspection and, as a result, Akshay was in default of its obligations under the License Agreement, (b) pursuant to the License Agreement, it had 30 days within which to cure the QA default, and (c) if the default was not cured, then reservation service to the Facility might be suspended and the License Agreement might be subject to termination.

38.     On October 2, 2013, RWI conducted another QA inspection of the Facility.  By letter dated  October 9, 2013, a true copy of which is attached hereto as Exhibit E, RWI advised Akshay that (a) the Facility received a failing score in the QA inspection and, as a result, Akshay was in default of its obligations under the License Agreement, (b) had until November 9, 2013 to cure the QA default, and (c) if the default was not cured, then reservation service to the Facility might be suspended and the License Agreement might be subject to termination.

39.     By letter dated December 31, 2013, a true copy of which is attached as Exhibit F, RWI terminated the License Agreement, effective December 31, 2013, and advised Akshay that (a) it was to immediately discontinue the use of all trade names, service marks, signs, and other forms of advertising, and other indicia of operation as a Ramada® Facility, and to discontinue the use of other materials on the premises effectively to distinguish the same from its former appearance as a Ramada® System facility, (b) all items bearing the Ramada® Marks had to be removed, (c) all signs and any listings in directories and similar guides in which the Facility was identified as a Ramada® had to be changed, (d) it was required to pay to RWI as liquidated damages for premature termination the sum of $146,000.00 as required under the License Agreement, (e) it had to de-identify the Facility within 10 days from the receipt of the notice, and (f) demand was made for all outstanding Recurring Fees through the date of termination.

40.     The termination of the License Agreement precludes Akshay from any further use of the Ramada® Marks in or around the Facility.

41.    The termination of the License Agreement precludes Akshay from any further use of the Ramada® Marks to induce the traveling public to use the Facility in any way.

42.    Since the termination of the License Agreement, Akshay has continued to use the Ramada® Marks to induce the traveling public to rent guest rooms at the Facility.

43.    Since the termination of the License Agreement, Akshay has used the Ramada® Marks without authorization to rent rooms through, among other things, failure to remove Ramada® signage and continuing to identify the Facility as a Ramada® guest lodging facility in response to telephone inquiries as to whether or not the Facility is a Ramada®.

44.    By letter dated May 8, 2015, a true copy of which is attached as Exhibit G, RWI reiterated Akshay's post-termination obligations under the License Agreement, including the requirement that, upon termination, Akshay completely "de-identify" the Facility as a Ramada®.

45.    Akshay has continued to misuse the Ramada® Marks despite receiving notification from RWI to cease and desist from the misuse of the Ramada® Marks.

## FIRST COUNT

46.    RWI repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 45 of the Verified Complaint.

47.    Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), provides in pertinent part that "[a]ny person who shall, without the consent of the registrant — use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in

10

connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant . . . ."

48.     Akshay marketed, promoted, and rented, and continues to market, promote, and rent rooms at the Facility through the unauthorized use of the Ramada® Marks, and such use caused and is likely to continue to cause confusion or mistake among prospective or actual customers, in violation of Section 32 of the Lanham Act.

49.     Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part that "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to affiliation . . . or as to the origin, sponsorship, or approval of . . . goods and/or services . . . shall be liable in a civil action . . . ."

50.     The acts of Akshay in marketing, promoting, and renting rooms at the Facility, through and with the Ramada® Marks, constitute:

(a)     a false designation of origin;

(b)     a false and misleading description of fact; and

(c)     a false and misleading representation of fact;

that caused and are likely to continue to cause confusion, or to cause mistake, or deception, as to the affiliation of Akshay's Facility with RWI, and to cause confusion, or to cause mistake, or deception,

to the effect that RWI sponsors or approves of the guest lodging services that Akshay provides at the Facility, all in violation of Section 43(a) of the Lanham Act.

51.    Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), provides in pertinent part that "[t]he owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection."

52.    Akshay's use of the Ramada® Marks in connection with goods and services at the Facility, after the Ramada® Marks became famous, caused and will continue to cause dilution and disparagement of the distinctive quality of the Ramada® Marks, and lessened and will continue to lessen the capacity of the Ramada® Marks to identify and distinguish the goods and services of RWI, all in violation of Section 43(c) of the Lanham Act.

53.    Akshay's on-going acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act are malicious, fraudulent, willful, and deliberate.

54.    Akshay's on-going acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act have inflicted and continue to inflict irreparable harm on RWI.

55.    RWI has no adequate remedy at law.

56.    No previous injunctive relief has been awarded with respect to this matter in this case or any other case.

WHEREFORE, pursuant to 15 U.S.C. §§ 1114, and 1125(a) & (c), RWI demands judgment against Akshay:

(a)     Preliminarily and permanently restraining and enjoining Akshay, its affiliates, subsidiaries, officers, agents, servants, employees and attorneys, and all those who act in concert or participation with them, from marketing, promoting, or selling guest lodging services at the Facility through and with the Ramada® Marks; and

(b)     Granting compensatory damages, treble damages, attorneys' fees, prejudgment interest, costs of suit, and such other and further relief as this Court shall deem just and proper.

## SECOND COUNT

57.     RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 56 of the Verified Complaint.

58.     Pursuant to sections 3.8 and 4.8 of the License Agreement, Akshay agreed to allow RWI to examine, audit, and make copies of Akshay's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

59.     Akshay has engaged in acts and practices, as described, which amount to infringement of the Ramada® Marks in an unlawful, unfair, and fraudulent manner which is likely to confuse the public.

60.     As a result, Akshay owes restitution and the disgorgement of profits, in an amount unknown to RWI, and which amount cannot be ascertained without an accounting of the

13

receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Akshay.

WHEREFORE, RWI demands judgment ordering that Akshay account to RWI for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility through and with the Ramada® Marks.

### THIRD COUNT

61.     RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 60 of the Verified Complaint.

62.     By letter dated December 31, 2013, RWI terminated the License Agreement, effective December 31, 2013, due to Akshay's failure to cure its quality assurance defaults under the License Agreement.

63.     Sections 12.1 and 18.4 of the License Agreement provides that, in the event of termination of the License Agreement due to action of the Licensee, Akshay shall pay liquidated damages to RWI within 30 days of termination.

64.     As a result of the termination of the License Agreement, Akshay is obligated to pay RWI liquidated damages in the amount of $146,000.00, as calculated pursuant to sections 12.1 and 18.4 of the License Agreement.

65.     Notwithstanding RWI's demand for payment, Akshay has failed to pay RWI the liquidated damages as required in sections 12.1 and 18.4 of the License Agreement.

66.     RWI has been damaged by Akshay's failure to pay liquidated damages.

**WHEREFORE**, RWI demands judgment against Akshay for liquidated damages in the amount of $146,000.00, together with interest, attorneys' fees, and costs of suit.

## FOURTH COUNT

67.     RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 66 of the Verified Complaint.

68.     By virtue of the premature termination of the License Agreement, RWI sustained a loss of future revenue over the remainder of the fifteen-year term of the License Agreement.

69.     If the Court determines that Akshay is not liable to pay RWI liquidated damages as required by sections 12.1 and 18.4 of the License Agreement then, in the alternative, Akshay is liable to RWI for actual damages for the premature termination of the License Agreement.

70.     RWI has been damaged by Akshay's breach of its obligation to operate a Ramada® guest lodging facility for the remaining term of the License Agreement.

**WHEREFORE**, RWI demands judgment against Akshay for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

## FIFTH COUNT

71.     RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 70 of the Verified Complaint.

72.     Pursuant to section 7, section 18.3 and Schedule C of the License Agreement, Akshay was obligated to remit Recurring Fees to RWI.

73.     Despite its obligation to do so, Akshay failed to remit certain of the Recurring Fees due and owing under the License Agreement, in the current amount of $29,437.90.

74.     Akshay's failure to remit the agreed Recurring Fees constitutes a breach of the License Agreement and has damaged RWI.

**WHEREFORE**, RWI demands judgment against Akshay for the Recurring Fees due and owing under the License Agreement, in the current amount of $29,437.90, together with interest, attorneys' fees, and costs of suit.

## SIXTH COUNT

75.     RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 74 of the Verified Complaint.

76.     At the time of the termination of the License Agreement, Akshay was obligated to pay RWI Recurring Fees.

77.     Despite its obligation to do so, Akshay failed to pay certain of the Recurring Fees due and owing under the License Agreement, in the current amount of $29,437.90.

78.     In addition, Akshay benefited from its wrongful use of the Ramada®
Marks after termination of the License Agreement and paid no royalty or other Recurring Fees to
RWI in return for that benefit.

79.     Akshay's failure to compensate RWI constitutes unjust enrichment and
has damaged RWI.

**WHEREFORE**, RWI demands judgment against Akshay for the Recurring Fees
due and owing under the License Agreement, in the current amount of $29,437.90, together with
interest, attorneys' fees, and costs of suit, and all royalties and other Recurring Fees that should be
paid to compensate RWI for the period during which Akshay misused the Ramada® Marks and was
thereby unjustly enriched, together with interest and costs of suit.

## <u>SEVENTH COUNT</u>

80.     RWI repeats and makes a part hereof each and every allegation contained
in paragraphs 1 through 79 of the Verified Complaint.

81.     Pursuant to the terms of the Guaranty, Nanitalwala and Haque agreed,
among other things, that upon a default under the License Agreement, they would immediately
make each payment and perform each obligation required of Akshay under the License
Agreement.

82.     Despite their obligation to do so, Nanitalwala and Haque have failed to
make any payments or perform or cause Akshay to perform each obligation required under the
License Agreement.

83.     Pursuant to the Guaranty, Nanitalwala and Haque are liable to RWI for Akshay's liquidated damages in the amount of $146,000.00, or actual damages in an amount to be determined at trial, and Akshay's Recurring Fees due and owing under the License Agreement, in the current amount of $29,437.90, and for those additional Recurring Fees attributable to the period during which Akshay has misused the Ramada® Marks.

**WHEREFORE**, RWI demands judgment against Nanitalwala and Haque for damages in the amount of:

(a)     All liquidated damages or actual damages and Recurring Fees due and owing under the License Agreement, together with interest, attorneys' fees, and costs of suit; and

(b)     All profits, royalties, and other Recurring Fees that should be paid to compensate RWI for the period during which Akshay misused the Ramada® Marks and was thereby unjustly enriched, together with interest, attorneys' fees and costs of suit.

## EIGHTH COUNT

84.     RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 83 of the Verified Complaint.

85.     By letter dated December 31, 2013, RWI terminated the License Agreement, effective December 31, 2013, due to Akshay's failure to cure its quality assurance defaults under the License Agreement.

86.     Section 13.2 of the License Agreement provides that, when the License Agreement is terminated, RWI has the right to "without prior notice enter the Facility, and any other parcels, . . . and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that [Akshay did] not remove[] or obliterate[] within five days after termination."

87.     Akshay continues to market, promote, and rent rooms at the Facility through the unauthorized use of the Ramada® Marks, and such use caused and is likely to continue to cause confusion or mistake among prospective or actual customers.

88.     Akshay's unauthorized use of the Ramada® Marks has inflicted and continues to inflict irreparable harm on RWI.

WHEREFORE, RWI demands judgment declaring that RWI, or its authorized agent, has the right, without prior notice to Defendants, to enter the property at the Facility and remove any and all exterior signage, exterior items and other exterior materials displaying the Ramada® Marks.

**LeClairRyan**
Attorneys for Plaintiff,
Ramada Worldwide Inc.


By: _____
        **BRYAN P. COUCH**

Dated: 5/27/15

19

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

**LeClairRyan**
Attorneys for Plaintiff,
Ramada Worldwide Inc.

By: _____
     **BRYAN P. COUCH**

Dated: 5/27/15

## VERIFICATION

STATE OF NEW JERSEY    )
                         ) ss:
COUNTY OF MORRIS      )

        Suzanne Fenimore, of full age, being duly sworn according to law, upon her oath, deposes and says:

        I am Senior Director of Contracts Compliance for Ramada Worldwide Inc., which is plaintiff in this action.

        I have read the foregoing Verified Complaint and all the allegations contained therein.  Except as to allegations alleged upon information and belief, which allegations I believe to be true, all the allegations in the Verified Complaint are true based on my personal knowledge, the records of RWI or information available through employees of RWI.

                                            **SUZANNE FENIMORE**

Sworn and subscribed to before
me this _____ day of May, 2015

_____
       NOTARY PUBLIC

**CINDY J. O'CONNOR**
**Notary Public**
**State of New Jersey**
**My Commission Expires Feb. 13, 2020**

# EXHIBIT A

Location **KISSIMMEE, FL**
Entity No \_\_108093\_\_
Unit No \_\_18310\_\_

# RAMADA WORLDWIDE INC.
## LICENSE AGREEMENT

THIS LICENSE AGREEMENT ("Agreement"), dated Sept 28, 2006, is between **RAMADA WORLDWIDE INC.**, a Delaware corporation ("we", "our" or "us"), and **AKSHAY HOTELS INC.**, a Florida corporation ("you")  The definitions of capitalized terms are found in Appendix A  In consideration of the following mutual promises, the parties agree as follows

**1. License.**  We have the exclusive right to license and franchise to you the distinctive "Ramada" System for providing transient guest lodging services  We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination  You will call the Facility a **"Ramada Inn."** You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion  You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term

**2. Ramada Inns National Association.**

2 1  **Membership.**  You automatically become a member of the Ramada Inns National Association ("RINA"), an unincorporated association  Other Chain licensees are also members of RINA  RINA may consider and discuss common issues relating to advertising and operation of facilities in the System and, through its Executive Committee, make recommendations to us regarding such issues and other matters

2 2  **RINA Conference.**  You or your representative will attend each RINA Conference when it is held  You will pay not less than one "Conference Registration Fee" for each Facility you own  Additional Facility representatives may attend subject to conference policies and after payment of an additional Conference Registration Fee for each such additional attendee  You will pay the costs of transportation, lodging and meals (except those we provide as part of the Conference) for your attendees

**3. Your Improvement and Operating Obligations.**  Your obligations to improve, operate and maintain the Facility are

3 1  **Improvements.**  You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards  You must provide us with proof that you own or lease the Facility before or within 30 days after the Effective Date  You must begin renovation of the Facility no later than thirty (30) days after the Effective Date  The deadline for completing the pre-opening phase of conversion and renovation, when the Facility must score 200 or fewer

1

points under our quality assurance inspection system (or equivalent score under a successor quality assurance scoring system we employ), and be ready to open for business under the System, is ninety (90) days after the Effective Date   All renovations will comply with System Standards, any Approved Plans, Schedule B and any Punch List attached to this Agreement Your general contractor or you must carry the insurance required under this Agreement during renovation   You must complete the pre-opening renovation specified on the Punch List and the Facility must pass its pre-opening quality assurance inspection with a score of 200 or fewer points (or equivalent score under a successor quality assurance scoring system we employ), before we consider the Facility to be ready to open under the System   You must continue renovation and improvement of the Facility after the Opening Date if the Punch List requires We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if (1) you do not commence or complete the pre-opening or post-opening improvements of the Facility by the dates specified in this Section, or (2) you prematurely identify the Facility as a Chain Facility or begin operation under the System name described in Schedule B in violation of Section 3 3 and you fail to either complete the pre-opening Improvement Obligation or cease operating and/or identifying the Facility under the Marks and System within five days after we send you written notice of default   Time is of the essence for the Improvement Obligation   We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation   You will pay us a non-refundable extension fee of $2 00 per room for each day of any extension of the deadline for completing pre-opening improvements   This fee will be payable to us after each 30 days of the extension   You will pay us the balance of the extension fee outstanding when the Facility opens under the System 10 days after the Opening Date   The grant of an extension will not waive any other default existing at the time the extension is granted

3 2  **Improvement Plans.**   You will create plans and specifications for the work described in Section 3 1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location   We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like   Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements   We will not be liable to your lenders, contractors, employees, guests, others or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction   Any material variation from the Approved Plans requires our prior written approval    You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request   We may inspect the work while in progress without prior notice

3 3  **Pre-Opening.**   You may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our approval or as permitted under and strictly in accordance with the System Standards Manual   If you identify the Facility as a Chain Facility or operate the Facility under a Mark before the Opening Date without our express written consent, then in addition to our remedies under Sections 3 1 and 11 2, you will begin paying the Royalty to us, as specified in

Section 7 1, from the date you identify or operate the Facility using the Mark   We may delay the Opening Date until you pay the Royalty accruing under this Section

3 4 **Operation.** You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards   You will keep the Facility in a clean, neat, and sanitary condition   You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards   The Facility will be managed by either a management company or an individual manager with significant training and experience in general management of similar lodging facilities   The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual   You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility, only with our prior written consent which we will not unreasonably withhold or delay   Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility

3 5 **Training.** You (or a person with executive authority if you are an entity) and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4 1 we designate as mandatory for licensees or general managers, respectively   You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement   You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4 1, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility

3 6 **Marketing.**  You will participate in System marketing programs, including the Directory and the Reservation System   You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System   You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants   You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards   You may implement, at your option and expense, your own local advertising   Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication   You will stop using any non-conforming, out-dated or misleading advertising materials if we so request

3 6 1 You will participate in any regional management association ("RMA") of Chain licensees formed to provide regional marketing, training, and other benefits for Chain Facilities in your area   You will pay the RMA Fee described in Schedule C to support the RMA's activities, if and when levied

3 6 2   The Facility must participate in our Chain-wide Internet marketing activities like other marketing programs, including arrangements we make with third party distribution channels You shall provide us with information and photographs of the Facility in accordance with System Standards for posting on the Chain website  The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary  You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards  You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with Chain-wide Internet marketing activities  You must honor the terms of any participation agreement you sign for Internet marketing  You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis, provided that the activities carry aggregate fees per transaction of not more than the sum of the full agent commission specified on Schedule C for sales agents, plus 10% of the Chain's reported average daily rate for the preceding calendar year  We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement

3 7  **Governmental Matters.**  You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote  You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings  You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224

### 3.8 Financial Books & Records; Audits.

3 8 1  The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards  You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement

3 8 2  Upon our request, you will send to us copies of financial statements, tax returns, and other records relating to the Facility for the applicable accounting period that we require under this Agreement and System Standards  We may notify you of a date on which we propose to audit the Facility's books and records at the Facility  You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date  You need to inform us where the books and records will be produced  You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements for the Facility  We may also perform an audit of the Facility's books and records without

advance notice  Your staff must cooperate with and assist our auditors to perform any audit we conduct

3 8 3  We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3 8 2 within 30 days after the date of the initial audit, (ii) you cancel 2 or more previously scheduled audits, (iii) you refuse to admit our auditors during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records at the audit or send them to us as required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit  Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3 8, an "Accounting Procedure Notice "  You must also pay any deficiency in Recurring Fees, any Audit Fee we assess you for your default of Section 3 8 as described in Section 4 8 and/or other charges we identify and invoice as a result of the audit  The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year

3 9  **Inspections.**  You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement  You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice  The inspections will commence during normal business hours although we may observe Facility operation at any time  You and the Facility staff will cooperate with the inspector performing the inspection  If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any reinspection fee specified in System Standards Manuals (which is $750 on the Effective Date and will not exceed $2,500) plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection  We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score  We may publish and disclose the results of quality assurance inspections and guest surveys

3 10  **Insurance.**  You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual  Unless we instruct you otherwise, your liability insurance policies will name Ramada Worldwide, Inc , Wyndham Worldwide Corporation, their current and former affiliates, successors and assigns as additional insureds

3 11  **Conferences.**  You or your representative will attend each annual RINA conference and pay the Conference Registration Fee described in Section 2 2   Mandatory recurrent training for licensees and general managers described in Section 4 1 4 may be held at a RINA conference   The Fee will be the same for all Chain Facilities that we license in the United States   You will receive reasonable notice of a Chain conference

3 12  **Purchasing.**  You will purchase or obtain certain items we designate as proprietary or that bear or depict the Marks only from suppliers we approve   You must lease your exterior signage face plates from our approved leasing company   You may purchase or lease other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards

3 13  **Good Will.**  You will use reasonable efforts to protect, maintain and promote the name "Ramada" and its distinguishing characteristics, and the other Marks   You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System   You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities   You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners

3 14  **Facility Modifications.**  You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay   You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility   If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay   You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards

3 15  **Courtesy Lodging.**  You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time

3 16  **Minor Renovations.**  Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 60 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount   You will perform the Minor Renovations as and when the Minor Renovation Notice requires   We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged no more than 125 points and the most recent quality assurance inspection score for the Facility was no more than 150 points (or

equivalent scores under a successor quality assurance scoring system we employ), when the Facility is otherwise eligible for a Minor Renovation

**4. Our Operating and Service Obligations.** We will provide you with the following services and assistance

4 1 **Training.** We may offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager and owner orientation training, remedial training and supplemental training

4 1 1 **General Manager Orientation Training.** We will offer at a location in the United States we designate a general manager orientation training program The program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility We may also offer certain Internet-based training as a supplement to the classroom training experience Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 90 days after the Opening Date Any replacement general manager must complete general manager orientation to our satisfaction within 90 days after he/she assumes the position If we do not offer a place in general manager orientation within the above time frame, your replacement general manager must attend the next program held at which we offer a place Your general manager for the Facility must complete general manager orientation even if you employ managers at other Chain Facilities who have already received this training We charge you tuition for general manager orientation which is payable before the scheduled date of the program The tuition for your first general manager is $1,100 For any replacement general manager, you must pay the tuition in effect for the program when your manager attends the program You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits We may, at our option, automatically schedule your initial or replacement general manager for a class to be held within the required time period (an "auto-assigned class") and invoice you when we notify you about the date of the class If your general manager is unable to attend that class, you must notify us at least 15 days before the training start date and re-schedule the general manager for another class to be held within the 90 day period We may charge you "No-Show Fees" or "Cancellation Fees" if your general manager fails to attend orientation within the required time period or fails to attend a program we have scheduled for him or her without giving us at least 15 days notice of cancellation See Section 4 1 5

4 1 2 **Owner Orientation Training.** We will offer an owner orientation training program to familiarize you with the System, the Chain, and our services If this is your first System license, you (or a person with executive authority if you are an entity) must attend owner orientation preferably within 60 days before, but no later than 60 days after, the Opening Date If we do not offer a place in owner orientation within this time period, you must attend the next program held at which we offer a place Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option We charge you tuition of $825 which is payable before the scheduled date for the program You must also pay for your travel, lodging, meal and incidental expenses If you are unable to attend an orientation program that you have scheduled with us, you must notify us at least 15 days before

the start date and schedule attendance at another class to be held within the 90 day period  We may charge you No-Show or Cancellation Fees if you fail to attend any mandatory orientation program within the required time period or fail to attend a program we have scheduled for you without giving us at least 15 days notice of cancellation  See Section 4 1 5

4 1 3  **Remedial Training.** We may require you, your general manager and/or your staff to participate in remedial training if the Facility fails multiple quality assurance inspections and/or experiences significant complaints to our guest services department, as a condition to avoiding termination or to resumption of reservation service  This training may be offered at our corporate offices, at a regional location, on-line, or at the Facility  You must pay the tuition in effect for this program when it is offered to you  If the training is provided at the Facility, you must provide lodging for our trainers  Tuition for remedial training must be paid before the training commences  The length of the remedial training could be up to five days, depending on the severity of the quality assurance and/or customer service issues

4 1 4  **Supplemental Training.** We may offer other mandatory or optional training programs for reasonable tuition or without charge  This training could be offered in our U S  training center or other locations or held in conjunction with a Chain lodging conference  You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training  We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices  We may also offer Internet-based training via the Chain's intranet website

4 1 5  **No-Show and Cancellation Fees.** If you or your general manager fails to attend orientation within the required time period, we may charge you a No-Show Fee equal to 50% of the tuition for the program  If you or any member of your staff cancels participation in any training program less than 15 days before it is scheduled to be held or fails to attend a training program as scheduled (including any auto-assigned class) without notifying us in advance, we may charge you a Cancellation Fee of up to 100% of the tuition for the program as we establish from time to time  No-Show and Cancellation Fees are in addition to the regular tuition which is payable by you for any mandatory training program  We may assess you additional No-Show or Cancellation Fees for continued failures by you under Section 4 1

4 2  **Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties), with funds allocated from the collections of the RINA Services Assessment Fees, a computerized Reservation System or such technological substitute(s) as we determine, in our discretion  We will use the allocated RINA Services Assessment Fees for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System  We will provide software maintenance for the software we license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us or our affiliate  The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term  We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties  We will not offer callers to our

general consumer toll free reservation telephone number in the United States the opportunity to make reservations for other lodging chains

## 4 3  Marketing.

4 3 1  We will promote public awareness and usage of Chain Facilities with funds allocated from collections of the RINA Services Assessment Fees by implementing advertising, promotion, publicity, market research and other marketing programs, training programs and related activities, and the production and distribution of Chain publications and directories of hotels We will determine in our discretion  (i) The nature and type of media placement, (ii) The allocation (if any) among international, national, regional and local markets, and (iii) The nature and type of advertising copy, other materials and programs    We or an affiliate may be reimbursed from RINA Services Assessment Fees for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services   We are not obligated to supplement or advance funds available from collections of the RINA Services Assessment Fees to pay for marketing activities    We do not promise that the Facility or you will benefit directly or proportionately from marketing activities

4 3 2  We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs

4 3 3  We will publish the Chain Directory   We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication   We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements   We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories

4 4  **Purchasing and Other Services.**  We may offer optional assistance to you with purchasing items used at or in the Facility   Our affiliates may offer this service on our behalf   We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts   We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards   We may offer optional architectural and design services for the Facility for a separate fee

4 5  **The System**   We will control and establish requirements for all aspects of the System   We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions   We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances

**4.6   Consultations and Standards Compliance.**   We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct.   We will provide telephone and mail consultation on Facility operation and marketing through our representatives.   We will offer you access to any Internet website we may maintain to provide Chain licensees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement.   We may limit or deny access to any such website while you are in default under this Agreement.

**4.7   System Standards Manual and Other Publications.**   We will specify System Standards in the System Standards Manual, policy statements or other publications.   We will lend you one copy of the System Standards Manual promptly after we sign this Agreement.   We will send you any System Standards Manual revisions and/or supplements as and when issued.   We will send you all other publications for Chain licensees and all separate policy statements in effect from time to time.

**4.8   Inspections and Audits.**   We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection   We may impose a reinspection fee and will charge you for our costs as provided in Section 3.9.   You will pay us an "Audit Fee" of $1,000.00 when we invoice you for an Audit Fee under Section 3.8.   We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs, but not more than 5% per year on a cumulative basis   Our inspections are solely for the purposes of checking compliance with System Standards.

**5.   Term.** The Term begins on the Effective Date and expires at the end of the fifteenth License Year.   Some of your duties and obligations will survive termination or expiration of this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

**6.   Application and Initial Fees.**   We should receive from you a non-refundable Application Fee of $1,000.00.   You will pay us a non-refundable Initial Fee in the amount of **$17,500.00,** when you sign this Agreement, which is fully earned when we sign this Agreement.

**7.   Recurring Fees, Taxes and Interest.**

7.1   You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) fifteen days after the month in which they accrue, without billing or demand.   Recurring Fees include the following:

7.1.1   A "Royalty" equal to four percent (4.0%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

10

7 1 2  A "RINA Services Assessment Fee" as set forth in Schedule C for advertising, marketing, training, the Reservation System and other related services and programs, accrues from the Opening Date until the end of the Term, including during suspension periods   On behalf of RINA, we collect and deposit the Fees from licensees, then disburse and administer the funds collected by means of a separate account or accounts   The RINA Services Assessment Fee is subject to change for all Chain Facilities, and new fees and charges may be assessed for new services, by substituting a new Schedule C or otherwise, but only upon the recommendation of the RINA Executive Committee and after our approval   You will also pay or reimburse us for travel and other agent commissions paid for certain reservations at the Facility and a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet and other reservation systems and networks   We may charge a reasonable service fee for this service   We may charge Facilities using the Reservation System outside the United States for reservation service using a different formula   We may use the RINA Services Assessment Fees we collect, in whole or in part, to reimburse our reasonable direct and indirect costs, overhead or other expenses of providing marketing, training and reservation services

7 2  You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for the privilege of doing business by us in your State   You will pay Taxes to us when due

7 3  "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1 5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid

7 4  If a transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new licensee for the Facility

## 8. Indemnifications.

8 1   Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven   You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury   This exclusion

from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property

8 2  You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee   You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest   We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters

8 3  We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name   You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you   You will cooperate with our defense and resolution of the claim   We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others

## 9   Your Assignments, Transfers and Conveyances.

9 1  **Transfer of the Facility.**  This Agreement is personal to you (and your owners if you are an entity)   We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you   You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent   If a Transfer is to occur, the transferee or you must comply with Section 9 3   Your License is subject to termination when the Transfer occurs   The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility   The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13   You and your owners may, only with our prior written consent and after you comply with Sections 9 3 and 9 6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise   Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers

9 2  **Public Offerings and Registered Securities.**  You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000   Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities

Dealers, Inc (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9 1

9 3 **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a licensee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new license applicant, pay the Application and Relicense Fees then in effect, sign the form of License Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were an existing facility converting to the System, as we reasonably determine We will provide a Punch List of improvements we will require after the transferee's Application is submitted to us We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities or, in the alternative, condition our approval of the Transfer on one or more of the following limit the transferee's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the License when you sell the Facility and pay us Liquidated Damages under Section 12 1 at the same rate as you would pay if the termination occurred before the Opening Date Such payment would be due and payable when you transfer possession of the Facility We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise Our consent to the transaction will not be effective until these conditions are satisfied

9 4 **Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee No Transfer will be deemed to occur You also must not be in default and you must comply with the application and notice procedures specified in Sections 9 3 and 9 6 Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the License Agreement form then offered prospective licensees No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement You must comply with this Section if you transfer the Facility to a Permitted Transferee A transfer resulting from a death may occur even if you are in default under this Agreement

9 5 **Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility

9 6 **Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility We will respond to all requests for our consent and notices of Permitted Transferee transactions

within a reasonable time not to exceed 30 days   You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner   You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request

**10.  Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent   We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement

**11.  Default and Termination.**

11 1  **Default.**  In addition to the matters identified in Sections 3 1 and 3 8, you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement   If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you, under Section 11 2   We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed   In the case of quality assurance default, if you have acted diligently to cure the default but cannot do so and have entered into a written improvement agreement with us within 30 days after the failing inspection, you may cure the default within 90 days after the failing inspection   We may terminate the License if you do not perform that improvement agreement

11 2  **Termination.**  We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11 1 or we are authorized to terminate under Section 3 1, (2) you discontinue operating the Facility as a "Ramada", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious to or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or License Agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest owners contest in court the

ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests

### 11.3  Casualty and Condemnation.

11 3 1  You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available   You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations   You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty   This restoration will be completed within 180 days after the Casualty   You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first   If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13   You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty

11 3 2  You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date   This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority

11 4  **Our Other Remedies.**  We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default   All RINA Services Assessment Fees and related Reservation System user fees accrue during the suspension period   We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards   Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform   We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Service Interruption Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration   We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory   You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief   We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice   Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults

11 5  **Your Remedies**  If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time or not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation  To the extent permitted by applicable law, this action shall be your exclusive remedy  We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to  lost profits or revenues

## 12.  Liquidated Damages.

12 1 Generally  If we terminate the License under Section 11 2  or you terminate this Agreement (except under Section 11 3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us Liquidated Damages within 30 days following the date of Termination  If Termination occurs during the last two License Years of the Term, Liquidated Damages will be the lesser of (i) the amount specified in Section 18 4, or (ii) the average daily fees based on a percentage of Gross Room Revenues accruing under Section 7 1 during the 12 full calendar months preceding the month in which Termination occurs multiplied by the number of days remaining in the unexpired Term (the "Ending Period") at the date of Termination  You will also pay any applicable Taxes assessed on such payment.  Before the last two License Years, Liquidated Damages will be **as set forth in Section 18.4.**  If we terminate this Agreement before the Opening Date  you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable after the Opening Date.  Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected

11 2 Condemnation Payments  In the event a Condemnation is to occur  you will pay us the fees set forth in Section  for a period of one year after we receive the initial notice of condemnation described in Section 11 3 2, or until the Condemnation occurs  whichever is longer  You will pay us Liquidated Damages equal to the average daily Royalties and RINA Services Assessment Fees for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year notice period expires.  This payment will be made  within 30 days after Condemnation is completed (when you close the facility or you deliver it to the condemning authority)   You will pay no Liquidated Damages if the Condemnation is completed after the one year notice period expires  but the fees set forth in Section 7 must be paid when due until Condemnation is completed

**13.  Your Duties At and After Termination**  When the License or this Agreement terminates for any reason whatsoever



RAMCO
311468/22 AUGUST 2006

13 1  **System Usage Ceases.**  You will immediately stop using the System to operate and identify the Facility  You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility  You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features  You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces  You will cease all Internet marketing using any Marks to identify the Facility

13 2  **Other Duties.**  You will pay all amounts owed to us under this Agreement within 10 days after termination  You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a "Ramada", including the RINA Services Assessment Fees for so long as the Facility receives service from the Reservation System  We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11 4  We may notify third parties that the Facility is no longer associated with the Chain  We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10 00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination  You will promptly pay or reimburse us for our cost of removing such items, net of the $10 00 purchase price for signage  We will exercise reasonable care in removing or painting over signage  We will have no obligation or liability to restore the Facility to its condition prior to removing the signage  We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you

13 3  **Advance Reservations.**  The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions

13 4  **Survival of Certain Provisions.**  Sections 3 8 (as to audits, for 2 years after termination), 3 13, 7 (as to amounts accruing through termination), 8, 11 4, 12, 13, 15, 16 and 17 survive termination of the License and this Agreement, whether termination is initiated by you or us, even if termination is wrongful

**14.  Your Representations and Warranties.**  You expressly represent and warrant to us as follows

14 1  **Quiet Enjoyment and Financing.**  You own, or will own prior to commencing improvement, or lease, the Location and the Facility  You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility  You have, when you sign this Agreement, and will maintain during the

17

Terml adequate financial liquidity and financial resources to perform your obligations under this Agreement

14 2  **This Transaction.**  You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement   You have obtained all necessary approvals of your owners, Board of Directors and lenders   No executory franchise, license, or affiliation agreement for the Facility exists other than this Agreement   Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject   Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application   You will submit to us the documents about the Facility, you, your owners and your finances that we request in the License Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement   To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U S  Executive Order 13224, in lists published by the U S  Department of the Treasury's Office of Foreign Assets Control, or otherwise

14 3  **No Misrepresentations or Implied Covenants.**  All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances   There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement

## 15. Proprietary Rights.

15 1  **Marks and System.**  You will not acquire any interest in or right to use the System or Marks except under this Agreement   You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing

15 2  **Inurements.**  All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit   No good will shall attach to any secondary designator that you use

15 3  **Other Locations and Systems.** We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory defined in Section 17 8  You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks  We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc

15 4  **Confidential Information.** You will take all appropriate actions to preserve the confidentiality of all Confidential Information  Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement  You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software)  You will use Confidential Information only for the Facility and to perform under this Agreement  Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U S  Copyright Act, as amended  Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years  We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information

15 5  **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware  We alone handle disputes with third parties concerning use of all or any part of the System  You will cooperate with our efforts to resolve these disputes  We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material

15 6  **The Internet.** You may use the Internet to market the Facility subject to this Agreement and System Standards  You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark without our consent  You will assign to us any such

identification at our request without compensation or consideration   You must make available through the Reservation System and the Chain website all rates you offer to the general public via Internet marketing arrangements with third parties   You must participate in the Chain's best available rate on the Internet guarantee or successor program   The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary   You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards   Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15 2

16   **Relationship of Parties.**

16 1   **Independence.** You are an independent contractor   You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever   We and you have a business relationship based entirely on and circumscribed by this Agreement   No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement   You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees

16 2   **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly   The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities

17. **Legal Matters.**

17 1   **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect   If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected   However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party

17 2   **Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice   Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel   All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective   We may unilaterally revise Schedule C when this Agreement so permits

20

17 3  **Notices.**  Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, or (iii) by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party (x) at its address stated below or as it may otherwise designate by notice, or (y) by such other means as to result in actual or constructive receipt by the person or office holder designated below  The parties may also communicate via electronic mail between addresses to be established by notice  You consent to receive electronic mail from us  Notices shall be deemed given on the date delivered or date of attempted delivery, if refused

Ramada Worldwide Inc
Our address   1 Sylvan Way, P O  Box 278, Parsippany, New Jersey 07054-0278
Attention  Vice President-Franchise Administration,
Fax No  (973) 496-5359

Your name  Akshay Hotels Inc
Your address  2145 E  Irlo Bronson Memorial Highway, Kissimmee, FL 34744
Attention  Shahzad Haque
Your fax No  (407) 932-2467

17 4  **Remedies.**  Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity  The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement

17 5  **Miscellaneous.**  This Agreement is exclusively for the benefit of the parties  There are no third party beneficiaries  No agreement between us and anyone else is for your benefit  The section headings in this Agreement are for convenience of reference only

17 6  **Choice of Law; Venue; Dispute Resolution.**

17 6 1  This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles  The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey

17 6 2  The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives  If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation  Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc  We will provide you with the contact address for that organization  The mediation will be conducted by a mutually acceptable and neutral third party  If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation

17 6 3 You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you

**17.6.4  WAIVER OF JURY TRIAL.  THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE LICENSOR, THE LICENSEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

**17.7  Special Acknowledgments.  You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

**17.7.1  You received our UFOC for prospective licensees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us.  You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.**

**17.7.2  Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.**

**17.7.3  This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.**

**17.7.4  You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.**

**17.7.5  You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.**

17 8  **Protected Territory.**  We will not own, operate, lease, manage, or license any party but you to operate a Chain Facility in the "Protected Territory", defined below, while this Agreement is in effect  We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you  We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory  While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise (i) any guest lodging facility other than the Facility in the Protected Territory unless we or our affiliate licenses the facility, and/or (ii) any time share resort, vacation club,

residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, for any facility or business that shares directly or indirectly, common areas, amenities, recreation facilities, services, supplies or support activities with the Facility. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its license with us terminates or is not renewed. The Protected Territory fairly represents the Facility's trading area, and you acknowledge that There are no express or implied territorial rights or agreements between the parties except as stated in this Section By electing to include this section in your Agreement, you irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or occupancy of the Facility or decide whether to add the proposed Chain Facility to the Chain based on the potential effect of the proposed Chain Facility on the Facility or its performance The covenants in this Section are mutually dependent, if you breach this Section, your Protected Territory will be the Location only. The Protected Territory means **all the area within ¼ mile on either of the centerline of US 192, between the points on the centerline located three and one half (3.5) miles east and three and one half (3.5) miles west of the front door of the Facility (Latitude 28.28800°N and Longitude 81.35703°W)**.

18.   **Special Stipulations.**   The following special stipulations apply, to this Agreement and supersede any inconsistent or conflicting provisions. You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties. These are personal to you and are not transferable or assignable except to a Permitted Transferee.

18.1  **Your Additional Termination Right.** You may terminate the License without cause or penalty effective only, on the fifth and tenth anniversary of the Opening Date provided you give us at least six (6) months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination. You will pay no Liquidated Damages if you satisfy the conditions of the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores more than 125 points (or its then equivalent) on a quality assurance inspection and then fails to achieve a score less than 125 points (or its then equivalent) in a reinspection to be performed no sooner than 90 days after the initial inspection. You will not exercise this right if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless you first obtain SBA's consent.



18 2   **Our Additional Termination Right.** We may terminate the License without cause or penalty effective only on the fifth and tenth anniversary of the Opening Date provided we give you at least six (6) months prior written notice of termination. You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. We will not exercise this right if you notify us that the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless we first obtain SBA's consent.

18 3.   **Special Combined Fees.** Notwithstanding Section 7 1, you will pay a "Combined Fee," consisting of the Royalty and the Marketing Fees (excluding commissions and related service charges, Internet fees, the Special Marketing Assessment, service fees and charges, guest reward and affinity program fees, guest complaint assessments, GDS Fees and similar fees and charges described in Schedule C), to us at the rates set forth in this Section, **provided that the Facility opens by the deadline specified in Section 3.1 of this Agreement:**

18.3 1  The Combined Fee shall be seven percent (7 0%) of Gross Room Revenues accruing during the first License Year; and

18 3 2  The Combined Fee shall be seven and a half percent (7 5%) of Gross Room Revenues accruing during the second License Year; and

18 3 3  The Combined Fee shall be eight percent (8 0%) of Gross Room Revenues accruing during the third License Year, and

18 3 4  The Royalty and Marketing Fees shall be computed and paid at the rates specified in Section 7 1 on Gross Room Revenues accruing after the third License Year.

18 3 5  The rate changes set forth in this Section automatically terminate without notice or opportunity to cure  and the Combined Fee shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any  in the notice of default, or (ii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of more than 125 (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of less than 125 in a reinspection to be performed not less than 60 days after the initial inspection

18 4  **Liquidated Damages.** Liquidated Damages payable under Section 12 1 for a Termination that occurs before the last two License Years will be One Thousand Dollars ($1 000 00) for each guest room of the Facility you are authorized to operate at the time of Termination



**PLEASE INITIAL**

IN WITNESS WHEREOF, the parties have executed this Agreement on this 28th day of Sept 28 , 2006 and agree to be bound by the terms and conditions of this Agreement as of the Effective Date

**WE:**
**RAMADA WORLDWIDE INC.:**

By _____
        Vice President

Attest _____
        Assistant Secretary

**YOU, as licensee**
**AKSHAY HOTELS INC.**

By _____
        (Vice) President

Attest _____

## APPENDIX A

### DEFINITIONS

<u>Agreement</u> means this License Agreement

<u>Application Fee</u> means the fee you pay when you submit your Application under Section 6

<u>Approved Plans</u> means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3

<u>Casualty</u> means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control

<u>Chain</u> means the network of Chain Facilities

<u>Chain Facility</u> means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks

<u>Condemnation</u> means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation

<u>Conference Registration Fee</u> means the fee charged for attendance at the annual RINA conference

<u>Confidential Information</u> means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence   Confidential Information includes the "Standards of Operation and Design Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software

<u>Design Standards</u> mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility

<u>Directory</u> means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Ramada facilities located outside the United States, Canada and Mexico

25

Effective Date means the date we insert in the Preamble of this Agreement after we sign it

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction   Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner   An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date   An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners   An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards

FF&E means furniture, fixtures and equipment

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility

Gross Room Revenues means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment, vending machine receipts, and federal, state and local sales, occupancy and use taxes

RAMEXCI
204166 Q3 AUGUST 2006

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1

License Year means

(i) *If the Opening Date occurs on the first day of a month* the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period, or

(ii) *If the Opening Date does not occur on the first day of a month* the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty

Location means the parcel of land situated at **2145 E. Irlo Bronson Memorial Highway, Kissimmee, FL 34744**, as more fully described in Schedule A

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection, and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20 00 on the Effective Date) if the drawee dishonors any check that you submit to us

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Ramada" and other marks (U S   Reg   Nos   849,591 and 1,191,422) and (ii)

trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere

Minor Renovation means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3 16

Minor Renovation Ceiling Amount means $3,000 00 per guest room

Minor Renovation Notice means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3 16

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations

Permitted Transferee means (1) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (11) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (111) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor

Punch List means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, RINA Services Assessment Fees, and other reservation fees and charges as stated in Section 7

Relicense Fee means the fee your transferee or you pay to us under Section 7 when a Transfer occurs

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4 2

RINA means the Ramada Inns National Association

RAMEXC1
204166 Q3 AUGUST 2006

RINA Services Assessment Fees means the assessments charged as set forth in Section 7 1 2

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility

Royalty means the monthly fee you pay to us for use of the System under Section 7 1 1 "Royalties" means the aggregate of all amounts owed as a Royalty

Service Interruption Fee means the fee you pay us when we suspend Central Reservation Service because you default under this Agreement, in the amount specified in Schedule C

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following (a) the Marks, (b) other intellectual property, including Confidential Information, System Standards Manual and know-how, (c) marketing, advertising, publicity and other promotional materials and programs, (d) System Standards, (e) training programs and materials, (f) quality assurance inspection and scoring programs, and (g) the Reservation System

System Standards means the standards for participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage

System Standards Manual means the Standards of Operation and Design Manual and any other manual we publish or distribute specifying the System Standards

Taxes means the amounts payable under Section 7 2 of this Agreement

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5

Termination means a termination of the License under Sections 11 1 or 11 2 or your termination of the License or this Agreement

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer,

Case 2:15-cv-03972-ES-MAH   Document 1   Filed 06/12/15   Page 53 of 114 PageID: 53

or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility   A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction

"You" and "Your" means and refers to the party named as licensee identified in the first paragraph of this Agreement and its Permitted Transferees

"We", "Our" and "Us" means and refers to Ramada Worldwide Inc , a Delaware corporation, its successors and assigns

Case 2:15-cv-03972-ES-MAH   Document 1   Filed 06/12/15   Page 54 of 114 PageID: 54

**SCHEDULE A**

**(Legal Description of Facility)**

RAMEXC1
204166 Q3 AUGUST 2006

LARRY WHALEY,
CLERK OF THE CIRCUIT COURT
OSCEOLA COUNTY, FLORIDA

BOOK  1381    PAGE  0688
INSTRUMENT #  97-015156
DATE 02/18/97 TIME 15:10
VERIFIED BY EJW

DOC STAMP      $29,750.00

This instrument prepared by and
after recording return to

A  GUY NEFF, ESQ
Maguire, Voorhis & Wells, P.A
200 South Orange Avenue, Suite 3000
Orlando, Florida 32801

- - - - - - - - - - - - - - [SPACE ABOVE THIS LINE FOR RECORDING DATA] - - - - - - - - - - - - - - -

## SPECIAL WARRANTY DEED

THIS SPECIAL WARRANTY DEED made effective the 14th day of
February, 1997 by AVISTA PROPERTIES II, INC., a Florida
corporation, whose post office address is 3956 W. Colonial Drive,
Orlando, Florida  32808 ("Grantor"), to  AKSHAY HOTELS INC., a
Florida corporation, whose post office address is c/o Holiday Inn
Express, 2145 East Irlo Bronson Memorial Highway, Kissimmee,
Florida  34744 ("Grantee").

(Wherever used herein the terms "Grantor" and "Grantee" include all
the parties to this instrument and the heirs, legal representatives
and assigns of individuals, and the successors and assigns of
corporations.)

### W I T N E S S E T H:

That the Grantor, for and in consideration of the sum of
$10.00 and other valuable considerations, receipt whereof is hereby
acknowledged, hereby grants, bargains, sells, aliens, remises,
releases, conveys and confirms unto the Grantee, all that certain
land situate in Osceola, Florida, viz:

SEE EXHIBIT "A" ATTACHED HERETO AND BY THIS REFERENCE MADE A
PART HEREOF.

TOGETHER, with all the tenements, hereditaments and appurte-
nances thereto belonging or in anywise appertaining.

TO HAVE AND TO HOLD, the same in fee simple forever.

BY ACCEPTANCE OF THIS SPECIAL WARRANTY DEED the Grantee herein
covenants and agrees that Grantor (or any affiliates, subsidiaries
or principals of Grantor, individually or in concert) may freely
construct, convert and/or develop additional hotels, motels or any
"product" whatsoever under the Holiday Inn name and franchise (or
the franchise of any entity related thereto) in any location,
including the greater Orlando/Kissimmee area, and Grantee agrees

not to object to or oppose any such activity by Grantor. This covenant shall run with the land and be binding on Grantee and Grantee's successors and/or assigns.

AND the Grantor hereby covenants with said Grantee that the Grantor is lawfully seized of said land in fee simple, that the Grantor has good right and lawful authority to sell and convey said land, and hereby warrants the title to said land and will defend the same against the lawful claims of all persons claiming by, through or under the said Grantor; subject to taxes accruing subsequent to December 31, 1996 and those matters set forth on Exhibit "B" attached to this Special Warranty Deed and incorporated herein by this reference.

IN WITNESS WHEREOF, Grantor has caused this Special Warranty Deed to be executed by its corporate officers hereunto duly authorized as of the day and year first above written.

Signed, sealed and delivered
in the presence of:

AVISTA PROPERTIES II, INC.,
a Florida corporation

Signature
Print Name: H Guy Neff

By: _____
    Anil I. Valbh
    President

Signature
Print Name: Joelyn Z. Clifton

[Corporate Seal]

STATE OF FLORIDA    )
                    ) SS.
COUNTY OF ORANGE    )

The foregoing Special Warranty Deed was acknowledged before me this 14th day of February, 1997 by ANIL I. VALBH, President of AVISTA PROPERTIES II, INC., a Florida corporation, on behalf of the corporation. He is personally known to me.

{Notary Seal}

Signature
Print Name: Joelyn Z. Clifton
Title: Notary Public
Commission Expires: 9/12/99

- 2 -

BOOK 1381 PAGE 0689

JOELYN Z CLIFTON
My Commission CC491051
Expires Sep. 12, 1999

BOOK  1381    PAGE  0690

## GRANTEE'S ACKNOWLEDGMENT AND ACCEPTANCE

We hereby acknowledge the covenant contained in this Special Warranty Deed and accept and approve the same.

Signed, sealed and delivered
in the presence of.

_____
Signature
Print Name: A Guy Neff

_____
Signature
Print Name: Joelyn Z. Clifton

AKSHAY HOTELS INC.,
a Florida corporation

By._____
   Ajay Khindri
   President

[Corporate Seal]

STATE OF FLORIDA      )
                      ) SS:
COUNTY OF Orange      )

The foregoing Special Warranty Deed was acknowledged before me this 14th day of February, 1997 by Ajay Khindri, President of AKSHAY HOTELS INC., a Florida corporation, on behalf of the corporation.  He [ ] is personally known to me or has produced florida driven license          as identification

{Notary Seal}    JOELYN Z CLIFTON
                 My Commission CC481051
                 Expires Sep. 12, 1999

_____
Signature
Print Name: Joelyn Z Clifton
Title:  Notary Public
Commission Expires: 9/12/99

Property Appraiser's Parcel I.D. Nos.: 30-25-30-0000-0016-0000 and 30-25-30-0000-0010-0000

Social Security Number of Grantees: 59 - 3417 408

(F \Real\802\AVISTAII 02)

- 3 -

BOOK 1381   PAGE 0691

## EXHIBIT "A"
## LEGAL DESCRIPTION

PARCEL 1

A portion of Sections 19 and 30, Township 25 South, Range 30 East, Osceola County, Florida, described as follows:

Commence at the Northwest corner of said Section 30; thence along the Northerly line of said Section 30, North 89°19'14" East 13.35 feet to the Northeasterly Right-of-Way line of U.S. 192 and 441, 200.00 feet wide; thence along said Northeasterly Right-of-Way line South 53°15'16" East 350 feet to the true Point of Beginning; thence North 36°44'44" East 409.18 feet, thence South 53°15'16" East 184.70 feet; thence South 54°45'46" East 584.72 feet; thence South 31°12'00" West 200.25 feet; thence North 55°46'46" West 276.67 feet; thence South 36°44'44" West 213.05 feet to the Northeasterly Right-of-Way line of said U.S. 192 and 441; thence along said Northeasterly Right-of-Way line North 53°15'16" West 512.17 feet to the True Point of Beginning.

Together with:

PARCEL 2

Being a portion of Section 30, Township 25 South, Range 30 East, County of Osceola, State of Florida, described as follows:

Beginning at the Northwest corner of Section 30, Township 25 South, Range 30 East, Osceola County, Florida; run thence North 89°19'14" East 13.35 feet to the Northeasterly Right-of-Way line of U.S. Highway 441 and 192, 200.00 feet wide; run thence South 53°15'16" East, along said Right-of-Way line 862.17 feet to the true Point of Beginning; continue thence along said Northeasterly Right-of-Way line South 53°15'16" East, 398.74 feet; run thence North 31°12'00" East, 200.00 feet; run thence South 53°15'16" East 200.00 feet to the Northwesterly Right-of-Way line of Simpson Road; run thence North 31°12'00" East, along said Right-of-Way line 34.05 feet; run thence North 54°45'46" West 300.00 feet; run thence North 55°46'46" West 276.76 feet; run thence South 36°44'44" West, 213.05 feet to the Point of Beginning.

f \real\802\AVISTA\02

- 4 -

BOOK   1381     PAGE   0692

## EXHIBIT "B"

1.  Current ad valorem real estate taxes and any assessments not confirmed and payable.

2.  Easement for Public Utility Mains by and between Holikiss Properties, Ltd , a Florida limited partnership and Service Facilities Corporation, dated October 6, 1975, recorded August 26, 1976 in Official Records Book 339, Page 244; as assigned to The City of Kissimmee by Assignment of Easements dated October 19, 1987, recorded October 19, 1987 in Official Records Book 856, Page 146, both of Public Records of Osceola County, Florida.  (As to Parcel 1)

3.  The rights, if any, of the Public, the County of Osceola and the State of Florida, in and to that portion of the subject property lying within the Right of Way of the Old County Road running on the East line of the Subject Property.  (As to Parcel 2)

4.  Matters as shown on the plat of Lake Shores Estates, according to the plat thereof as recorded in Plat Book 1, Page 234, Public Records of Osceola County, Florida  (As to Parcels 1 & 2)

5.  Resolution No. 85-14 of the City of St. Cloud, Florida, Declaring an Urban Service Area, Defining the Boundaries thereof; Establishing the Purpose of an Urban Service Area; Providing an Effective Date, recorded August 6, 1985 in Official Records Book 781, Page 2898, Public Records of Osceola County, Florida.

6.  Ordinance 85-Q of the City of St. Cloud, Florida Declaring an Urban Service Area; Defining the Boundaries thereof; Establishing the Purpose of an Urban Service Area; and Providing for an Effective Date, recorded September 3, 1985 in Official Records Book 783, Page 2351, Public Records of Osceola County, Florida.

7.  Ingress and Egress Reservations contained in that certain Quit Claim Deed by Eli Timoner, individually and as Trustee, and Alex S. Gordon, individually and as Trustee, to Eli Timoner and Joseph A. Garfield, as tenants in common, dated March 31, 1980, recorded April 29, 1980 in Official Records Book 478, Page 123; Corrective Warranty Deed by Edwin H. Cole and Eli Timoner, Trustees under the provisions of certain Land Trust Agreement #1, dated the 4th day of February, 1972, dated February 19, 1975, recorded March 14, 1975 in Official Records Book 305, Page 540, and that certain Special Warranty Deed by Holikiss, Inc , a Florida corporation in liquidation, to Eli

- 5 -

BOOK 1381    PAGE 0693

Timoner and Alex S. Gordon, Trustees, dated January 7, 1975, recorded July 2, 1976 in Official Records Book 335, Page 304, all of Public Records of Osceola County, Florida.

8.  UCC-Financing Statement between Avista Properties, II, Inc. (debtor), and GIAC Leasing Corporation (secured party), recorded October 4, 1995 in Official Records Book 1283, Page 2764; as assigned to Metlife Capital Corporation by Full Assignment recorded March 14, 1996 in Official Records Book 1314, Page 1759, both of Public Records of Osceola County, Florida. (NOTE: Encumbers unrecorded lease between original parties.)

9.  Rights of tenants in possession, as tenants only, under unrecorded leases.

10.  Notice of Proceedings For the Closing of Roads RV 96-55 recorded September 10, 1996 in Official Records Book 1349, Page 344, Public Records of Osceola County, Florida.

11.  Resolution RV 965 recorded September 10, 1996 in Official Records Book 1349, Page 348, Public Records of Osceola County, Florida.

12.  Notice of Adoption of Resolution RV 96-55 recorded September 10, 1996 in Official Records Book 1349, Page 351, Public Records of Osceola County, Florida.

13.  Drainage & Maintenance Easement Agreement by and between Osceola County, Florida and Avista Properties II, Inc., dated July 12, 1996, recorded September 10, 1996 in Official Records Book 1349, Page 354, Public Records of Osceola County, Florida.

F \Real\802\AVISTAII\02

STATE OF FLORIDA, COUNTY OF OSCEOLA, I HEREBY CERTIFY that the same is a true copy of the original document filed in this office.

LARRY WHALEY, Clerk Circuit Court

Dated 8-1-06  By _____ DC

- 6 -

## SCHEDULE B

PART I          YOUR OWNERS

| Name | Ownership Percentage | Type of Equity Interest | (Title) Office Held |
|------|---------------------|------------------------|--------------------|
| **Khalil Nanitalwala** | **75%** | **Common Stock** | |
| **Shahzad Haque** | **25%** | **Common Stock** | |

PART II               THE FACILITY

Primary designation of Facility  **Ramada Inn**

Number of approved guest rooms  146

Parking facilities (number of spaces, description)  at least 146

Other amenities, services and facilities

PART III     DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE
             COMPLETED AS THE IMPROVEMENT OBLIGATION

**[Punch List to be attached.]**

Initial



## RAMADA
W O R L D W I D E

### FRANCHISOR: RAMADA FRANCHISE SYSTEMS, INC.

### "SCHEDULE B PART III"
### PUNCHLIST FOR CONVERSION
### SEPTEMBER 5, 2006
### (Revised September 19, 2006)

| **FACILITY** | **TIER** | **GUESTROOMS** |
|---|---|---|
| Heritage Park Inn | Inn | 146 |
| 2145 E. Irlo Bronson Memorial Highway | | |
| Kissimmee, FL 34744 | | |

**OWNER/APPLICANT**
Shahzad Haque
(407) 341-1723

**SALESPERSON**
Scott Zanato
(813) 416-2849

**CONVERSION CONSULTANT**
Jerry James Clarke

### PROPERTY CONDITION SUMMARY

This 25+ year-old facility consists of one L-shaped, two-story, exterior-corridor, double-loaded guestroom building. There are two rectangular-shaped, single-story commercial buildings. The main (lobby) commercial building is connected to the guestroom building via a covered walkway. All buildings are of concrete construction with stucco facades. Landscaping will require upgrading/manicuring to maximize curb appeal.

The property is located along US Route 192, 12 miles South of Orlando International Airport (MCO). The market is comprised of 80% leisure and 20% commercial business. Area competition includes Days Inn, Quality Inn and Travelodge.

| | **EXISTING** | **STANDARD** |
|---|---|---|
| Lobby Area Dimensions | 924 SF | 800 SF |
| Breakfast Area Dimensions | 960 SF | N/A |
| Guestroom Dimensions | 312 SF (145) | 288 SF |
| Guestroom Dimensions | 624 SF (1) | |

### COMPLETION TIME

All items listed in this punchlist must be completed before opening as a Ramada

2

Heritage Park Inn
Kissimmee, FL

## 6 ATTACHMENTS

| | |
|---|---|
| 1 | Summary of F&B Standards (4 pages) |
| 2 | Complimentary Continental Breakfast Menu Summary (1 page) |
| 3 | Ramada Sundry Items (2 pages) |
| 4 | Ramada Hospitality Area/Mart Prototype (1 page) |
| 5 | Ramada Mart Drawings |
| 6 | Ramada Mart Plan View |

> **All Ramada properties are required to be in compliance with all items outlined in the Standards of Operations and Design Manual.  The following is a partial, but by no means a complete listing:**

- All new Ramada Owners and General Managers are required to complete orientation no later than 90 days after the opening date
- Property manager is required to be TripRewards certified and property must fully comply with all TripRewards requirements no later than 90 days after the opening date
- Ramada Inn exterior signage per System Standards
- Dumpster enclosure to conceal from guests' view
- Safe deposit boxes  1 per 20 guestrooms, minimum of 6
- Complimentary USA Today® newspapers (minimum 35) must be provided Monday through Friday
- One sanitary dispensing ice machine per 60 rooms
- Facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances
- Electronic locks on all guestroom entrance doors per Company specifications
- Electronic key cards must include the Ramada logo with the 800 number to central reservations and WWW.Ramada.com
- A self-closing device on all interior guestroom entrance doors
- A one-way viewer in all guestroom entrance doors
- Secondary entrance locks (chain or u-bar) on guestroom doors
- Hardwired smoke detectors with a backup system  This system may be a battery within the unit or a generator system that is capable of restoring electrical service in case of an outage
- A one-way, doorknob latch set and a separate, non-keyed, 1" deadbolt lock on all connecting room doors  Operating knobs must be located on room side only with flush plates on inside of doors
- A minimum of two framed pictures with glass fronts, (24" x 30" minimum), and/or one large picture with glass front (30" x 30" minimum)

3

Heritage Park Inn
Kissimmee, FL

---

*All Ramada properties are required to be in compliance with all items outlined in the Standards of Operations and Design Manual. The following is a partial, but by no means a complete listing (continued):*

- Night-lights are required in all guestrooms  Suggested placement for these night-lights include bathroom, vanity or entrance door area
- A full-length mirror (minimum 14" x 54") in each guestroom
- Removable wooden hook style hangers, 5 coat and 3 skirt
- UL approved fire resistant wastebaskets
- AM/FM clock radio in each guestroom
- A minimum of 80% of guestrooms must be prepared and designated as non-smoking rooms
- A UL rated coffee maker with automatic shut off and the required supplies in each room
- All guestrooms must be equipped with a full size ironing board and a steam iron with automatic shut off feature
- Minimum 27" remote control televisions are required
- A GFCI (Ground Fault Circuit Interrupter) outlet in vanity areas is required
- A wall-mounted hairdryer is required in each room
- Same day laundry/valet service Monday thru Friday
- Company requires that all properties maintain housekeeping at the highest levels
- Logo supplies must be available at the entry inspection but may not be placed in the guestrooms until official opening
- Provide complimentary wireless, high-speed Internet access in all public spaces and guestrooms from an approved Vendor (i e  Guest Tek, Netopia and SolutionInc )

---

## PROPERTY SIGNAGE

1   Signage must be leased and manufactured only by vendors approved in advance by the Franchisor, and may not be installed without prior written approval.  **Your License Agreement controls your use of signage and timing of installation.**  All existing signage (building and pylon, etc ) must be removed   Modification of the existing signage or face replacement is prohibited

2   Complete installation of new high-rise stanchion and paint per System Standards   Contact the Brand Identity Department at (973) 753-7251 for assistance

4

Heritage Park Inn
Kissimmee, FL

## PROPERTY EXTERIOR

1   Renovate building exteriors to include
   a     Clean, repair/refinish and recoat stucco (façades, design features, columns, staircase tower and porte cochere) to provide a consistent, like-new appearance
   b     Paint exteriors (concrete fascia, soffits, railings, doors and trim)  Contact Design Services at (800) 225-5411 (option #3) for recommended color schemes
   c     Replace metal fascia bands below roofline
   d     Replace windows to eliminate any that have broken seals (fogged appearance)
   e     Refinish/paint walkways and stairways

2   Upgrade parking lot to include
   a     Resurface and stripe parking lot
   b     Paint curbing

3   Prune overgrown greenery throughout the grounds to provide a manicured, professional appearance

4   Renovate swimming pool area to include
   a     Replace gates   New gates are to be self-closing and latching
   b     Paint fence

5   Renovate swimming pool restrooms to include
   a     Replace sink faucets
   b     Remove toilet seat/lid units   A toilet seat only is required in public facilities Lids are not acceptable

## PUBLIC AREAS

1   Renovate lobby/front desk area to include
   a     Replace entrance doors to include handles or prep, prime and paint to provide a like-new appearance
   b     Replace or remove accent throw pillows on sofas

2   A phone system that will offer a voice mail system, computer data ports and automated wake-up calls with a greeting message is required

5

Heritage Park Inn
Kissimmee, FL

## PUBLIC AREAS CONTINUED

3    Renovate lobby public restrooms to include
    a    Replace vanity/sink units   Corian or cultured marble are acceptable replacement options  Laminate finishes are not acceptable   Ensure vanities have adequate skirting and a concealed support system
    b    Replace handicap sink faucets
    c    Install vanity lighting   A new decorative fixture is required (incandescent or fluorescent lighting is acceptable)   Fixture must be wall mounted over the vanity area
    d    The existing textured wall finish above ceramic tiles will be acceptable if refinished/painted to provide a like-new appearance
    e    Replace ceiling tiles where stained or mismatched  Ensure all replacements match existing tiles in style, color and texture   If replacements do not match total replacement will be required
    f    Remove toilet seat/lid units   A toilet seat only is required in public facilities  Lids are not acceptable

4    Renovate vending areas to include
    a    Deep clean tile flooring
    b    Remove plastic cover from ice machines

5    Provide a Business Center to be in compliance with the following specifications
    a    Copying Capability
    b    Computer with word processing program
    c    Printer Fax Machine
    d    Minimum 2 phones with data ports
    e    Free access for 800 numbers
    f    Office supplies i e   pens, pads, stapler, etc
    g    The minimum hours of operation are from 8 AM to 8 PM

6    Provide an exercise room facility to be in compliance with the following specifications
    a    The minimum is one treadmill and one multi-station weight machine
    b    Additional two units should be 'state of the art' aerobic equipment approved by Ramada
    c    Wall mounted TV – Wall/Ceiling (Minimum 27" flat screen HDTV is required)
    d    Weight Scale
    e    Three coat/towel hooks
    f    Telephone with direct dial to front desk
    g    Full view wall mirror
    h    Fresh towels and soiled linen disposal

6

Heritage Park Inn
Kissimmee, FL

## PUBLIC AREAS CONTINUED

   i    Water cooler
   j    All equipment must be maintained and inspected as per the manufacturer guidelines
   k    Emergency instructions, assumed liability signage and guest use only signage must be prominently displayed
   l    The fitness room must have an electronic card reader which is operable by any guestroom key card

7   Provide flammable storage per System Standards

8   Provide complimentary wireless, high-speed Internet access in all public spaces from an approved Vendor (i e Guest Tek, Netopia and SolutionInc )

9   Property manager is required to be TripRewards certified and property must fully comply with all TripRewards requirements no later than 90 days after opening

## PROPERTY MANAGEMENT SYSTEM REQUIREMENTS

1   A Company approved Property Management System (PMS) is required Requirements are below, or as specified in your License Agreement
   a   Dot matrix printers will require a paper hole for the bottom feed of forms
   b   A space for the file server must be made in the front desk area or in an area which is accessible 24-hours a day including the ability for the night auditor to utilize it
   c   Space must be located near the file server for any interface equipment that will be needed, i e call accounting and Point of Sale (POS) terminals When considering the placement of this equipment remember that it will need electrical outlets and that the interface vendor will need to run cable from the interface equipment to the Property Management System (PMS)

2   Hardware power requirements are as follows
   a   Proper electrical connections must be in place or the Property Management System will not be installed Refer to the Installation Guide for specifications
   b   One Uninterrupted Power Supply (UPS) unit will be supplied with the package The UPS must be placed at least three feet from the file server
   c   The file server and its monitor will plug into the UPS using 2 of its power outlets
   d   Each workstation will require 2 power outlets
   e   Each printer and modem will require 1 power outlet each

7

Heritage Park Inn
Kissimmee, FL

## PROPERTY MANAGEMENT SYSTEM REQUIREMENTS CONTINUED

    f.    The UPS will require 1 dedicated power outlet on its own dedicated circuit breaker

3    Telephone line requirements are as follows
    a    Two dedicated telephone lines with their own phone numbers are required  Three are recommended  No other modems, fax machines, etc are to be connected to these phone lines  For the third phone line, used for Internet access, we will allow a line to run through your phone switch
    b    Two modems will be supplied with the package

4    Interface vendors must be contacted in advance to insure that they will meet the requirements  The franchisee is responsible for arranging any required interface upgrades that may be necessary and for the testing of these upgrades

5    All cable must be from a Company approved vendor  Refer to the Installation Guide for specifications

## FOOD AND BEVERAGE FACILITIES

1    The existing breakfast area does not meet current Ramada specifications  Reconstruction of area to accommodate all specifications as in Attachment #1 (Summary of F&B standards) and Attachments #4, #5 and #6 (Ramada Hospitality Area/Mart Prototypes) is required  Plans are required to be submitted to Design Services for approval prior to commencement of work
    a    Replace ceiling tiles where stained or mismatched  Ensure all replacements match existing tiles in style, color and texture  If replacements do not match total replacement will be required
    b    Refinish existing chairs to a like-new condition and provide an additional six matching, fabric upholstered chairs  Company requires seating for 48
    c    Refinish cabinets to a like-new condition
    d    Remove Holiday Inn Express display items

2.    Provide complimentary continental breakfast menu items as per specifications in Attachment #2

8

Heritage Park Inn
Kissimmee, FL

## FOOD AND BEVERAGE FACILITIES CONTINUED

3    Construction of a Ramada Convenience Mart is required as per specifications in
Attachments #1 and #4   Plans are required to be submitted to Design Services for
approval prior to commencement of work

4    Stock Ramada Convenience Mart with required Sundry items as per specifications in
Attachment #3

5    Meeting rooms must provide a comfortable and pleasing yet business-like atmosphere
Furnishings and fixtures must be color coordinated and in accordance with System
Standards   Renovate meeting rooms to include

    a    Replace carpet in Remington Room.  Minimum 32 ounce, cut pile carpet with
padding is required   Carpet must be designed for commercial traffic

    b    Professionally clean carpet in remaining meeting rooms   If carpet scores a
"Moderate" on the opening inspection, carpet must be replaced

    c    Upgrade walls to include·

        1    Replace vinyl wainscot in Bay Hill Room   New vinyl must be no less
than 22 ounces per linear yard

        2    Remove paneling and plywood wainscot in Remington Room and install
vinyl wallcovering or a matching textured finish to match upper portion of
walls

        3    The existing textured wall finish in Kissimmee Bay, Conference and
Remington rooms is acceptable if condition is maintained

    d    Replace ceiling tiles where stained and/or mismatched   Ensure all replacements
match existing tiles in style, color and texture   If replacements do not match, total
replacement will be required

    e    Replace blinds in Conference Room with decorative, 100% blackout draperies
Blinds are not acceptable

6    Renovate Kissimmee Bay Room and Remington Room public restrooms to include

    a    Replace vanities and sinks in Remington Room   Replace vanity/sink units in
Kissimmee Bay Room   Corian or cultured marble are acceptable replacement
options   Laminate finishes are not acceptable   Ensure vanities have adequate skirting
and a concealed support system

    b    Replace sink fixtures in Remington Room

    c    Replace vanity mirrors in Remington Room

    d    Install vanity lighting in Remington Room.  A new decorative fixture is required
(incandescent or fluorescent lighting is acceptable)   Fixture must be wall mounted
over the vanity area

9

Heritage Park Inn
Kissimmee, FL

## *FOOD AND BEVERAGE FACILITIES CONTINUED*

    e       The existing textured wall finish in Kissimmee Bay Room is acceptable if refinished to provide a consistent, like-new appearance

    f.       Replace ceramic tile flooring in Remington Room

    g       Replace/install vinyl wallcovering above ceramic tiles   New vinyl must be no less than 22 ounces per linear yard   Flat/smooth painted walls are not acceptable

    h       Replace ceiling tiles where stained and/or mismatched   Ensure all replacements match existing tiles in style, color and texture   If replacements do not match, total replacement will be required

    i       Remove toilet seat/lid units   A toilet seat only is required in public facilities Lids are not acceptable

## *GUESTROOMS/BATHS* (Rooms Inspected  263, 207, 104, 105, 165, 164, 163, 162, 158, 155, 132, 248, 240, 249, 251, 234, 227, 223, 260, 273, 274)

1    Remove separate deadbolt lock on entrance door #273 and install flush plates to conceal openings

2    Upgrade connecting door between rooms #273 and #274 to include
    a       Replace existing hollow door with a solid core type
    b       Install a second solid core door   Each connecting room is required to have a separate door
    c       Install a one-way, doorknob latch set and a separate, non-keyed, 1" deadbolt lock Operating knobs must be located on room side only with flush plates on inside of doors

3    Install a hardwired smoke detector with a backup system in each guestroom   This system may be a battery within the unit or a generator system that is capable of restoring electrical service in case of an outage

4    Renovate guestrooms to include
    a       All furniture, finishes and fixtures must coordinate with other room furnishings
    b       Provide complimentary wireless, high-speed Internet access in all guestrooms from an approved Vendor (i e  Guest Tek, Netopia and SolutionInc )
    c       Replace carpet except where newer as in room #234   Minimum 28 ounce, cut pile carpet with padding is required   Carpet must also be wall to wall

10

Heritage Park Inn
Kissimmee, FL

---

### GUESTROOMS/BATHS CONTINUED

    d    Replace/provide complete furniture package to include leisure chairs in room #273
Casegoods must be new upon installation  A minimum of one credenza, a framed
wall mirror, one headboard per bed, and one freestanding nightstand for a two-
bedded room, two for a one-bedded room is required  A writing surface is required
to consist of either a desk or an activity table  Two comfortable fabric upholstered
chairs per room are required

    e    Replace leisure chairs where stained and/or damaged as in rooms #248 and #155
Two comfortable fabric upholstered chairs per room are required

    f    Replace desk chairs  New chairs must be fabric upholstered

    g    Replace sofabeds where worn as in room #163  New sofabeds must be fabric
upholstered and coordinate with existing room decor

    h    Replace/provide complete lamp package in room #273  Provide 2 lamps per
headboard wall, a credenza lamp and a floor lamp at leisure area  All wall-mounted
lamps must have wire covers or molding, loose cords are not acceptable  Lamp
package must be neutral and contemporary (i e  brass)  The use of red or other
colors of anodized metal is not recommended

    i    Provide a matching second nightstand lamp in room #240

    j    **Replace bedspreads where damaged and/or worn**  Each bed must have a
quilted bedspread of an appropriate size for the bed

    k    Replace/provide draperies  New draperies must have blackout capabilities, be
pleated to double fullness, provide for overlapping of panels and must be baton or
mechanically operated

    l    Clean sheers where stained as in room #165  If stains remain, replacement or
removal is required

5    Installation of the following items per new System Standards is required
- Serta Concierge Emerald or Sealy Posturepedic Plush bedsets (mattress and boxsprings)
  **To be completed no later than 1year after opening.**
- Linen to include sheets (flat and fitted), pillows and pillowcases
- Complete inventory of terry stock to include washcloths, bath mats and bath and hand
  towels
- Moen Revolution showerheads, curved shower rods and Ramada specialty
  Hookless® shower curtains

6    Renovate bath areas to include
    a    Provide "Relax Retreat" amenities per System Standards
    b    Replace vanity mirrors where desilvered as in room #132  Mirrors are required to
extend the length of the vanity

11

Heritage Park Inn
Kissimmee, FL

**GUESTROOMS/BATHS CONTINUED**

c   Replace vanity lighting except where newer as in room #165  A new decorative
    fixture is required (incandescent or fluorescent lighting is acceptable)  Fixture must
    be wall mounted over the vanity area

d   Replace plumbing trim (sinks and bathtubs) where tarnished, scratched and/or
    pitted as in rooms #249, #234 and #105  Provide chrome stoppers where missing
    as in room #248

e   Professionally refinish textured walls where stained and/or peeling as in rooms
    #234 and #155 to provide a consistent appearance

f   Replace ceramic tile flooring where stained as in room #234  Company requires
    minimum 2" single color ceramic tiles (recommend 6" - 8" tiles)

g   Complete professional refinishing of bathtubs to provide a like-new appearance

12

Heritage Park Inn
Kissimmee, FL

---

HANDWRITTEN OR UNAUTHORIZED REVISIONS TO THIS PUNCHLIST ARE NOT
VALID AND DO NOT BIND THE FRANCHISOR  ANY AND ALL REVISIONS TO THIS
PUNCHLIST MUST BE MADE AND APPROVED BY THE FRANCHISOR'S QUALITY
ASSURANCE DEPARTMENT

---

This Punchlist identifies items that require action due to meet the Franchisor's standards  The
Franchisor does not warrant that completion of the items on this Punchlist will cause the
converting facility to be in compliance with any applicable federal, state, local codes, ordinances
or regulations  You (and your architect, contractor and engineer, if applicable) are solely
responsible for conforming the Facility to the requirements of federal, state and local codes,
ordinances and regulations that may apply to your site

This Punchlist has been prepared on the basis of a random sample inspection of the Facility on
the date specified  The owner is responsible for meeting all Franchisor Standards  All repairs,
replacements and improvements must cause the item to meet or exceed the Franchisor's
standards published in the Standards of Operation and Design Manual

This Punchlist will be subject to revision at the discretion of the Franchisor if the condition of
the facility changes materially or the License (Franchise) Agreement to which this is attached is
executed more than 90 days after the date of the Punchlist  Note, that ordinary wear and tear,
particularly during busy seasons, may result in the need for additional work to meet entry
standards of the Franchisor  Also, this Punchlist may become null and void if the property does
not enter the System within 180 days after the punchlist date or as otherwise specified by the
license (franchise) agreement

**This Punchlist is subject to revision by the Franchise Review Committee and should not be
considered to be final until the License Agreement for the inspected facility is executed by
the Company.**

**NOTE:** Any item on this Punchlist that is not required to be completed prior to opening as a
Ramada will continue to be evaluated for appearance and condition during all Quality Assurance
inspections conducted before the date when completion is required.

**This punchlist was revised on September 19, 2006. All previous copies are invalid.**

I        revised on 9/19/06 by  ams
Signed _____        Date  9 - 2 7 - c 6

Print Name  SHAHZAD  HAQUE
FL Kissimmee Heritage Park Inn CV RA

Attachment #1

**Summary of F&B Standards for the New Ramada**
(See Separate Standards for Ramada Plaza Hotels)

1   Minimum Food and Beverage Standards

All Ramada Inn properties are required to offer

A   Breakfast from 6 30 a m – 10 00 a m

- Full American breakfast (buffet or ala carte) in a full-service restaurant,

Or

- Continental Breakfast Buffet in a restaurant or Hospitality Area   If the Continental Breakfast Buffet option is chosen, it must be complimentary to guests

B   Lunch, dinner and snack service either

- By providing restaurant service for lunch for any 2-hour period between 11 30 a m – 2 00 p m  and for dinner for any 3-hour period between the hours of 5 00 p m – 10 00 p m ,

Or

- By providing a Ramada Convenience Mart, available to guests on a 24-hour basis

C   Alcoholic beverages (code permitting) either by having a bar/cocktail lounge or an assortment of wines and beers in the Ramada Mart

2   Hospitality Area

- The Hospitality Area is a signature feature of a breakfast-only Ramada  The Hospitality Area shall accommodate at minimum 20 seats or seating equivalent to 1/3 of the guestrooms, whichever is greater, as well as the buffet and pantry/storage areas   Must be conveniently accessible from the lobby  Seating must be designed to provide for a minimum space of 15 square feet per seat, plus buffet and pantry/storage areas  For a 100-room property, approximately 1,000 square feet would be required, depending on space configuration

- The Hospitality Area shall be designed as a multi-function area, with its primary function being to accommodate the Breakfast Buffet  The seating areas must also be designed to function as lounge-conversation areas to accommodate the service of afternoon coffee and snacks or an evening cocktail hour  Hospitality area layout and furniture plan must be submitted in advance to Ramada Franchise Systems for approval

- A uniformed attendant must staff the Hospitality Area during serving hours

- Appropriate taped background music must be provided (radio is not permitted)

- The Hospitality Area must be designated as non-smoking

- This space shall have an open, airy feel  This area shall be attractively decorated so that it coordinates with the rest of the property and enhances the image that the property is presenting to its customer

- The design of the ceiling shall compliment and be compatible with the lobby

- Ceiling lighting must be adjustable with dimmers or multiple switches and layout must coordinate with interior design plan  Lighting directly over breakfast area should be on separate switches

- A large screen television (32" minimum) is required in the Hospitality Area  The TV must be enclosed in built-in millwork or armoire unless wall mounted flat screen (50" minimum)

- Wall Treatment - Must be vinyl or textured finish  Vinyl must be a minimum of 20 oz (54" wide) and installed so that there will be a minimum of seams showing  The wall vinyl should meet flame spread of 0-25 and smoke development of 0-450

- Floor Treatment –Must be ceramic tile or stone (12" x 12" min ) or carpet  All carpeting shall be cut pile construction with a minimum face weight of 32 oz , 1/10 gauge or greater  Other styles of carpet must be submitted to corporate headquarters for approval  Branded continuous filament solution dyed nylon product is recommended  Olefin is not recommended  Carpet must pass Vetterman Drum test graded to meet commercial medium to heavy traffic

- Carpet Padding - All carpet padding must be synthetic hair/jute, be a minimum of 3/8" thickness, 40 oz per square yard weight, 7 0 cu  ft density, pass the flammability pill test DOC-FF1-70 and smoke density test (NBS)

- Window Treatment – All windows are to be appropriately covered with drapes and sheers with cornices  Fabric pattern/color should coordinate with the room design, drape fabric must be fire retardant  Blinds or shutters may be acceptable depending on design and require design approval

- Seating Areas – Chairs at tables must be a construction that is suitable for heavy-duty commercial use  Upholstery must coordinate with the overall design of the room, have a minimum of 30,000 double rub counts or greater, and have a stain resistant finish  All upholstery fabric shall conform to Class I criteria  Local, State or Federal codes may require more stringent flame retardant testing  Banquet / stackable chairs are not permitted

- Tables – Guest tables for Continental Breakfast must be 36" x 36", or 24" x 30", have a pressure laminate top with self-edging whose color coordinates with the design of the room

- Artwork – All artwork must coordinate with the rooms design, have a suitable frame with a single matt, be a minimum of 24" x 30"w size, installed with theft proof wall mounts and be of a quantity suitable to each individual room size  Recommend regional scenes for the artwork

Hospitality Area (cont'd )                                                   Page 3

- Accessories – The areas must be attractively accessorized, and all accessories, plants, centerpieces, accent pieces must coordinate with the overall room design

- Counter space must be a minimum of 20 linear feet and 24" deep  Counters must be built-in  Countertops must be tile, stone, pressure laminate or sealed wood  Banquet tables are not permitted

- At minimum one 0 7 cu  Ft  capacity-700-Watt, UL rated and NSF certified, commercial microwave unit is required to be displayed on the required counter space

- Electrical Outlets – Sufficient outlets must be provided above the countertop to service the microwave oven, toasters, chafing dishes (if electric), coffee warmers and other equipment

3    Pantry or Kitchen Area

- A Pantry Area or Kitchen is required, which is adjacent to the Hospitality Area (kitchen minimum is 250 square feet)  If a full American Breakfast is offered, the kitchen must contain primary cooking equipment, Ware Washing Equipment, Prep Counter, Storage, etc

- If a continental breakfast is served, primary cooking equipment is not required, and the pantry area must be large enough to accommodate all required equipment listed below (see Attachment #5 for reference)  Must meet all local codes

o    Pantry equipment must include  Commercial grade refrigerator, freezer, icemaker and microwave  A double sink must be provided, in addition, a wall mounted hand sink will be provided if required by local code  A prep counter, storage cabinets and waste receptacle must be provided  If china and silverware are used, a glass washer, glass dolly and glass racks must be provided

- At minimum one 0 7 cu  Ft  capacity-700-Watt, UL rated and NSF certified, commercial microwave unit is required in the pantry or kitchen area if a continental breakfast is served

- Cooling, heating, exhaust and tempered air shall be designed as per the equipment and usage

- Pantry or kitchen floor must have vinyl tile minimum  Non-skid pads should be installed in high traffic areas  Use moisture resistant gypsum board at all wet walls

- Pantry walls must be a minimum painted finish with high quality enamel or epoxy paint

- Pantry door shall be a minimum width of 3'  Door closers and kick plates shall be incorporated

- The Pantry ceiling shall be a smooth finish, painted drywall for maintenance purposes and must be washable  Vinyl finish lay in tile is also acceptable

Pantry or Kitchen Area (cont'd )                                                    Page 4

- Pantry lighting shall be fluorescent, general illumination   Outlets shall be appropriately spaced for current and future use   Plug (GFI) mold is suggested for work counter

4   Ramada Convenience Mart

- Minimum of 80 Square Feet   Recommend that the Mart adjoin the Front Desk or Hospitality Area

- Cooler/Freezer/Refrigerators/Shelves to be Set In, Trimmed with Molding, Well Lit

- High Quality Shelving, Racks, Display Cases, Lighting

- Sensor installed at the entrance to chime when a customer enters the Mart

- Ramada Convenience Mart minimum Sundry items requirements per Ramada standard   Inventory to be displayed in approved baskets, trays and racks

Attachment #2

| | Mandatory | Optional |
|---|---|---|
| Coffee/Tea | Freshly Brewed Regular & Decaf Coffee & Assorted Teas | Additional Flavored Coffee (*Folgers*® Regular & Decaf Recommended) (*Lipton*®Tea Recommended) |
| Juice | Orange/Apple/Cranberry | Additional Juices (*Minute Maid*® Recommended) |
| Milk | Whole and Skim (or 1%) Half & Half Creamers or Shelf-Stable Creamers Non-Dairy Coffee Creamers 3 Flavored Individual Creamers | Chocolate Milk |
| RTE Cereal | Minimum 6 Cold, 1 Hot a) Two Kids b) Two Mainstream c) One Senior d) One Health<br><br>Instant Hot Oatmeal | Additional Varieties (Kellogg's® Frosted Flakes®, Fruit Loops®) (Kellogg's ® Special K®, Rice Krispies®) (Kellogg's® Raisin Bran®) (*Quaker*® Instant Oatmeal Recommended) (Kellogg's® Low Fat Granola) Instant Cream of Wheat |
| Fruit | Bananas/Apples/Oranges | Seasonal Fruit, Grapefruit, Strawberries, Grapes, Pears, Tangerines, etc |
| Baked Goods | Three Non-Sweet  (Examples) a) White and Wheat Bread (Toast) b) Bagels c) English Muffins Three Sweet  (Examples) a) Muffins b) Danish c) Donuts | Croissants<br><br><br>Breakfast Bars (Kellogg's® Recommended) Pop Tarts (Kellogg's® Recommended) Honey Buns, Coffee Cake, Cinnamon Rolls |
| Toppings | Margarine, Butter, Cream Cheese, Jelly & Peanut Butter, Sugar and Sugar Substitute | |
| Yogurt | Minimum of 3 flavors (Dannon® or Yoplait® are Recommended) | |
| Hot Item | Choice of One Rotating Hot Breakfast Entree such as  Waffles, Breakfast Sandwiches, Pancakes or Eggs & Bacon | |

Health Conscious Item      An Atkins Friendly/Low-Carb Item (i e  Eggs & Bacon)

**Note.  Buffet Arrangement, Display Materials, Service Equipment Per Ramada Specifications**

6 in China plates, 6 oz  Juice glasses, 8 oz  China or glass coffee mugs or 6 oz  China cups with saucers and stainless flatware are highly recommended

Minimum Standards

- Disposable plates made of laminated foam, plastic or heavy paper
- 8 oz  Styrofoam coffee cups and 6 oz  heavy plastic juice cups
- Plastic utensils must be medium heavy to heavy weight

 

## RAMADA SUNDRY ITEMS  Attachment #3

| FOOD | |
|---|---|
| | 3 types of Microwavable Frozen Entrees |
| | 2 Frozen Desserts |
| | 1 Low Fat Yogurt |
| | 1 Regular Yogurt |
| | 2 Low Carb Ice Cream Bar |
| | 2 Types of Canned Entrees |
| | 2 Types of Canned Soups |
| | 4 Candy Bars |
| | 6 Snacks Pretzels, Potato Chips, Microwave Popcorn |
| | Cookies |
| | Power Bars - Low Carb |
| | Nuts |
| | Dried Fruit |
| | 2 Microwavable or Fresh Sandwiches |
| **DRINKS** | |
| | Min 5 Assortment of Sodas (regular and diet) |
| | Min 3 Assortment of Juices |
| | Min 2 Assortment of Milk |
| | Regular Water |
| | Sparkling Water |
| **MEDICAL SUPPLIES** | |
| | Antacid Medication |
| | Nyquil |
| | Dayquil |
| | Cold/sinus Supplies |
| | Contact Lense Cleaning Solution |
| | Eye Drops |
| | Headache Relieve |
| | Laxatives |
| | Pain Relievers |
| | Sleep Aids |
| | Assortment of Band Aids |
| | Chapstick |
| | Advil or equivalent |
| **PERSONAL SUPPLIES** | |
| | After Shave |
| | Antiperspirant Dedorant (men's/ladies) |
| | Feminine Napkins |
| | Hair Spray |
| | Shaving Cream |
| | Suntan Lotion/screen |
| | Tampons |
| **MISCELLANEOUS** | |
| | 3 Nationally Recognized Magazines |
| | Area and State maps |
| | Film - Min 2 speeds |
| | Disposable Camera |
| | Highlighters |
| | Computer Diskettes |

| OPTIONAL ITEMS | |
|---|---|
| | Cheese Snacks |
| | Throat Lozenges |
| | Advil or equivalent |
| | Clear Nail Polish |
| | Dental Floss |
| | Listerine Mint Strips |
| | Disposable Razors |
| | Lotion |
| | Bread, Peanut Butter & Jelly |
| | Condoms |
| | Fresh Salads |
| | White & Red Wine (local law permitting) |
| | Regular & Light Beer (local law permitting) |
| | Knee High Stockings |
| | Panty Hose |
| | Styling Gel |
| | Area Novelties |
| | Playing Cards |
| | Post Cards |
| | Paperback Books |
| | Baseball Caps |
| | Walkman |
| | Prepaid Phone Cards |
| | Calculator |
| | Lint Brush |
| | Shoe Polish |
| | Yearly Calendars |
| | Newspapers (local) |
| | Cassette Tapes (blank) |
| | Video Tapes |
| | Baby Food |
| | Diapers |
| | Pool Toys |
| | Coloring Books/Crayons |
| | Logo Items |
| | Guest Laundry Supplies |
| |   Detergent |
| |   Bleach |
| |   Fabric Softener |
| |   Starch |
| | Mouthwash |
| | Nail Clippers |
| | Nail Files |
| | Nail Polish Remover |
| | Tissues |
| | Toothpaste |
| | Toothbrush |
| | Tweezers |
| | Batteries - Min 4 types (AA / AAA / C / D) |
| | Sewing Kits |
| | Stamps |
| | Pencils |
| | Pens |

**Ramada Mart**
**Plan View**



RAMADA INN PROTOTYPE

DATE 4/28/06

Attachment #5



**COUNTER/SHELVING ELEVATION** (A)

**FREEZER/REFRIGERATOR CASE ELEVATION** (B)

*MART DRAWINGS*

*RAMADA INN PROTOTYPE*

DATE 9/2/04
SCHEME A

Attachment #6

# RAMADA WORLDWIDE INC.
## SCHEDULE C

### July 2006

A     RINA Services Assessment Fee

The RINA Services Assessment Fee is equal to 4 5% of Gross Room Revenues   The RINA Services Assessment Fee is subject to change for all Chain Facilities, and new fees and charges may be assessed for new services, but only upon the recommendation of the Executive Committee of RINA and our approval

B     RMA Fee

To provide additional regional marketing services through your RMA, we have established a mandatory "RMA Fee"   The RMA Fee is $15 00 per guest room per year, up to a maximum of $3,000 00 per year   The RMA Fee will be payable before the start of each year on a date that we establish and communicate to you at least 60 days in advance, and will be fully earned once the year begins   The RMA Fee is subject to change for all Chain Facilities, but only upon the recommendation of the Executive Committee of RINA and our approval   Each RMA may elect to charge supplemental RMA Fees with our approval

C     GDS and Internet Booking Fees

We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee for reservations processed through the global distribution systems ("GDS") or the Internet for your Facility   For hotel departures on or before September 14, 2006, the GDS Fee described in Section 7 is $4 50 per reservation processed through any GDS or through any Internet website powered by a GDS   The GDS Fee is $5 15 for departures after September 14, 2006   For hotel departures on or before September 14, 2006, Internet-originated reservations carry fees of $3 50 per reservation booked through sources other than GDS powered websites, our Chain website, or our direct connection to expedia com or hotels com   For departures after September 14, 2006, these Internet-originated reservations carry fees of $4 15 per reservation booked   We do not charge any fees for reservations booked through our Chain website or through our direct connection to expedia com or hotels com   GDS and Internet-originated reservations may carry a commission if the originator qualifies   If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable fee

D     Additional RINA Services Assessment Fees or Reservation System Charges

Agency and other commissions are typically 10% of the Gross Room Revenues generated by each reservation booked by an agency or other qualifying originator, plus our service charge of $ 35 per commissionable reservation ( 5% of commissionable revenue for departures after September 14, 2006)   Agencies which are part of a travel consortium or a travel management

33

company, including our affiliates, may charge additional commissions of up to 5% and/or participation fees to be included in their programs. The general sales agent commission (also known as the international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the agency commission.

We may assess you for additional fees or commissions charged us by distribution channels, travel intermediaries and retailers or for performing other services. By accepting reservations from the GDS, Internet, travel agencies and other intermediaries, you agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to them on your behalf or for Chain Facilities to participate in their programs.

If we suspend Central Reservation System Service because of your default under this Agreement, then you must pay us a Service Interruption Fee of $200 before we restore service.

You must (i) make available through the Central Reservation System and the Chain website room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. Beginning May 1, 2004 if a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through the Chain website or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the first room night to the guest without a room charge. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $25 to reimburse us for our administrative charges of handling the complaint.

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties including our affiliates. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. For providing and managing this activity we may receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. We will allocate these commissions to Royalties and RINA Services Assessment Fees in equal proportions. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights.

We or an affiliate may charge you a sales agent commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of affinity groups and organizations participating in our Member Benefits sales program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members.

34

E       Special Marketing Assessment

We charge a Special Marketing Assessment for your participation in the TripRewards® or successor guest loyalty program   Under TripRewards, program members staying at qualifying rates at Chain Facilities earn their choice of TripRewards points, airline miles or other program currency TripRewards points are redeemable for free stays at Chain Facilities and for travel, merchandise, entertainment and other awards   The Special Marketing Assessment is up to 5% of the Gross Room Revenues accruing from each qualifying stay at the Facility   We will proactively match and award members with points or other program currency they earn on qualified stays even if they do not present their TripRewards membership card upon check-in   You will be billed monthly in arrears for qualifying stays by program members during the preceding month

F       Guest Services Assessment

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest   If you do not respond to any complaint within 7 business days after we refer it to you and the guest contacts us again to seek resolution, we will charge you a "Guest Services Assessment" of $75 00, plus the costs we incur to settle the matter with the guest   In addition, if the number of guest complaints per 1,000 occupied roomnights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish with the approval of the RINA Executive Committee, we will charge you a "Processing Fee" of $25 00 for each additional complaint we receive during that year, regardless of whether you are able to resolve it to the guest's satisfaction   We may change or eliminate the Guest Services Assessment, the Processing Fee, the Annual Facility Allotment and/or the time for responding to and resolving a guest complaint on a Chain-wide basis at any time upon 30 days advance notice, with the approval of the RINA Executive Committee   The Guest Services Assessment and the Processing Fee are intended only to reimburse us for the costs of complaint handling and are not intended as penalties or liquidated damages   All guest complaints remain subject to indemnification under this Agreement

# EXHIBIT B

## GUARANTY

To induce Ramada Worldwide Inc., its successors and assigns ("you") to sign the License Agreement (the "Agreement") with the party named as the "Licensee," to which this Guaranty is attached, the undersigned, jointly and severally ("we," "our" or "us"), irrevocably and unconditionally (i), warrant to you that Licensee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Licensee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Licensee and notice from you we will immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of Licensee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Licensee to you arising at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

WITNESSES:                                      GUARANTORS:

_Julie Cushl..._                        _Khalil Ahmed_ _____ (Seal)
                                        Khalil Nanitalwala

_S. J. de Ruiter_                        _____ (Seal)
                                        Shahzad Haque

RAMEXCI
                                        16

# **<u>EXHIBIT C</u>**



# WYNDHAM
### HOTEL GROUP

Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 • fax (800) 880-9445
www.wyndhamworldwide.com

April 3, 2013

**VIA 2 DAY DELIVERY METHOD**

Mr. James Callahan
Akshay Hotels Inc.
2145 East Irlo Bronson Memorial Highway
Kissimmee, FL 34744

Re:  **NOTICE OF NON-CONFORMANCE** relating to Ramada® Unit #18310-68093-1, located in Kissimmee, FL (the "Facility")

Dear Mr. Callahan:

I write on behalf of Ramada Worldwide Inc., ("we," "our," or "us") regarding the License Agreement dated September 28, 2006, between Akshay Hotels Inc., ("you" or "your") and us (the "Agreement"). It has come to our attention that you are not meeting your Quality Assurance obligations pursuant to the Agreement. Our Quality Assurance Department conducted an inspection of the Facility on March 28, 2013. At that time, the Facility received a failing score of 62.80%-F. A copy of the QA Evaluation report was provided to you at the time of the inspection and is available for review on MyPortal.

We would like to work cooperatively with you to resolve your Quality Assurance issues. We request that you submit a detailed plan to Sean Marchessault, Director of Operations and Support ("DOS") outlining how you intend to address this matter. Please submit this plan to your DOS no later than fourteen days from the date of this notice.

We will re-inspect the Facility after at least ninety (90) days from the date of this Notice. Please be advised that you will be billed a re-inspection fee for the re-inspection of the Facility. Please know that if you have not addressed your Quality Assurance issues by the re-inspection, or entered into an acceptable Quality Assurance Improvement Plan, we will have no alternative but to send you a notice of default. If a default occurs, your access to the central reservation system may be suspended and the Agreement will be subject to termination.

# WYNDHAM
### HOTEL GROUP



















We look forward to working with you to resolve this issue.  In the meantime, if you have any questions, please feel free to contact the Operations Support Desk at (800) 221-7312.

Sincerely yours,

Suzanne Fenimore
Senior Director
Contracts Compliance

cc:     Shahzad Haque (Guarantor)
        Khalil Nanitalwala (Guarantor)
        Caryl Porter
        Sean Marchessault
        Tracy Ripa

UPS CampusShip: Shipment Receipt

 **Shipment Receipt**

**Transaction Date: 03 Apr 2013**          **Tracking Number:**   1Z22445X0290484402

**1 Address Information**

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Akshay Hotels, Inc. | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| James Callahan | Elena Danishovsky | Elena Danishovsky |
| Ramada | 22 Sylvan Way | 22 Sylvan Way |
| 2145 E. Irlo Bronson Memorial Highw | Parsippany NJ 07054 | Parsippany NJ 07054 |
| KISSIMMEE FL 347444417 | Telephone:973-753-7236 | Telephone:973-753-7236 |
| Telephone:(407) 846-4646 | | |

**2 Package Information**

| | Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|---|
| 1. | Letter | UPS Letter | | Reference # 1 - 006-1696 |

**3 UPS Shipping Service and Shipping Options**

| | |
|---|---|
| Service: | UPS 2nd Day Air |
| Guaranteed By: | End of Day Friday, Apr 5, 2013 |
| Shipping Fees Subtotal: | 16.52 USD |
| Transportation | 14.75 USD |
| Fuel Surcharge | 1.77 USD |

**4 Payment Information**

Bill Shipping Charges to:                    Shipper's Account 22445X

**A discount has been applied to the Daily rates for this shipment**

| | |
|---|---|
| Total Charged: | 16.52 USD |
| Negotiated Total: | 5.75 USD |

Note: Your invoice may vary from the displayed reference rates.
* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

# **<u>EXHIBIT D</u>**



**WYNDHAM**

HOTEL GROUP

Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 ● fax (800) 880-9445
www.wyndhamworldwide.com

August 14, 2013

<u>**VIA 2 DAY DELIVERY METHOD**</u>

Mr. James Callahan
Akshay Hotels Inc.
2145 East Irlo Bronson Memorial Highway
Kissimmee, FL 34744

Re:   **NOTICE OF QUALITY ASSURANCE DEFAULT relating to Ramada® Unit #18310-68093-1 located in Kissimmee, FL (the "Facility")**

Dear Mr. Callahan:

I write on behalf of Ramada Worldwide Inc., ("we," "us," or "our") regarding the License Agreement (the "Agreement") dated September 28, 2006, between Akshay Hotels Inc., ("you" or "your") and us.  We write to give you formal notice that you are in default under the Agreement.

The Agreement requires you to maintain the Facility according to System Standards.  Our Quality Assurance Consultant conducted an inspection of the Facility on August 5, 2013.  The Facility received a failing score of 58.27%-F.  We will re-inspect the Facility after at least thirty (30) days from the date of this Notice.  If the Facility does not receive a passing quality assurance score at this re-inspection, the Agreement may be subject to termination. Please be advised that you will be billed a re-inspection fee for the re-inspection of the Facility.

This Notice does not modify, replace, or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility.  We also reserve the right to take any interim steps permitted under the Agreement because of your default, such as suspending the Facility's access to our central reservation system. By copy of this Notice, we are also informing your Guarantors of your default.

**WYNDHAM**

HOTEL GROUP



      

        

Please be advised that a copy of the QA Evaluation report has been provided to you at the time of the inspection.

We hope you will take this opportunity to resolve your quality assurance default. If you have any questions regarding your default or how it can be timely cured, please contact your Operation Support Desk at (888) 575-4822.

Sincerely yours,

Joe Maida
Director
Contracts Compliance

cc:   Khalil Nanitalalwala (Guarantor)
      Shahzad Haque (Guarantor)
      Mark Young
      Tracy Ripa
      Mike Piccola
      Suzanne Fenimore



# EXHIBIT E



**WYNDHAM**

HOTEL GROUP

Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 ● fax (800) 880-9445
www.wyndhamworldwide.com

October 9, 2013

**VIA 2 DAY DELIVERY METHOD**

Mr. James Callahan
Akshay Hotels Inc.
2145 East Irlo Bronson Memorial Highway
Kissimmee, FL 34744

Re:   **NOTICE OF CONTINUING QUALITY ASSURANCE DEFAULT relating to Ramada® Unit #18310-68093-1 located in Kissimmee, FL (the "Facility")**

Dear Mr. Callahan:

I write on behalf of Ramada Worldwide Inc., ("we", "us" or "our") regarding the License Agreement dated September 28, 2006, between Akshay Hotels Inc., ("you" or "your") and us (the "Agreement"). You will recall that, on August 14, 2013, we sent you a default notice because of your failure to ensure that the Facility meets our quality assurance standards. That notice required you to cure the default by the time we conducted a re-inspection of the Facility. However, you did not cure your default within the time permitted as evidenced by the re-inspection score of 61.31% on October 2, 2013.

Your failure to cure your default within the time permitted also allows us to terminate the Agreement immediately upon written notice to you. We would prefer, however, to keep our affiliation with you. We will re-inspect the Facility on or after November 9, 2013. Please be advised that you will be billed a re-inspection fee for the re-inspection of the Facility. If the Facility does not receive a quality assurance score of 70.00% or more, pass the Food & Beverage segment of the re-inspection, and pass the Housekeeping segment of the re-inspection, the Agreement will remain subject to termination. Please understand that we are not waiving this default or any other default under the Agreement by extending your cure period. Also, please be advised that if you do not enter into an acceptable improvement plan with our Quality Assurance Department by October 16, 2013, we may suspend the Facility's access to our central reservation system due to your default. By copy of this Notice, we are also informing your Guarantors of your default.

**WYNDHAM**

HOTEL GROUP



      

        

Please be advised that a copy of the QA Evaluation report has been provided to you at the time of the inspection.

We hope you will take this opportunity to resolve your quality assurance default.  If you have any questions regarding your default or how it can be timely cured, please contact your Operations Support Desk at (888) 575-4822.

Sincerely yours,

Suzanne Fenimore
Senior Director
Contracts Compliance

cc:     Khalil Nanitalalwala (Guarantor)
        Shahzad Haque (Guarantor)
        Mark Young
        Tracy Ripa
        Mike Piccola
        Joe Maida

UPS CampusShip: Shipment Receipt                                      Page 1 of 1

 **Shipment Receipt**

**Transaction Date:** 09 Oct 2013          **Tracking Number:**        1Z22445X0293078006

**1**  Address Information

| | | |
|---|---|---|
| **Ship To:**<br>Akshay Hotels, Inc.<br>James Callahan<br>Ramada<br>2145 E. Irlo Bronson Memorial Highw<br>KISSIMMEE FL 347444417<br>Telephone:(407) 846-4646 | **Ship From:**<br>Wyndham Hotel Group - 22 Sylvan<br>Elena Danishevsky<br>22 Sylvan Way<br>Parsippany NJ 07054<br>Telephone:973-753-7236 | **Return Address:**<br>Wyndham Hotel Group - 22 Sylvan<br>Elena Danishevsky<br>22 Sylvan Way<br>Parsippany NJ 07054<br>Telephone:973-753-7236 |

**2**  Package Information

| Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|
| 1.  Letter | UPS Letter | | Reference # 1 - 006-1696<br>Reference # 2 -<br>Reference # 3 - |

**3**  UPS Shipping Service and Shipping Options

Service:                          UPS 2nd Day Air
Guaranteed By:                    End of Day Friday, Oct 11, 2013
Shipping Fees Subtotal:           **16.37 USD**
    Transportation            14.75 USD
    Fuel Surcharge            1.62 USD

**4**  Payment Information

Bill Shipping Charges to:                    Shipper's Account 22445X

**A discount has been applied to the Daily rates for this shipment**

Total Charged:                                                      16.37 USD
Negotiated Total:                                                   5.67 USD

Note: Your invoice may vary from the displayed reference rates.
* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

# EXHIBIT F



# WYNDHAM
## HOTEL GROUP

Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 ● fax (800) 880-9445
www.wyndhamworldwide.com

December 31, 2013

<u>**VIA OVERNIGHT DELIVERY METHOD**</u>

Mr. James Callahan
Hedo Capital Group
2145 East Irlo Bronson Memorial Highway
Kissimmee, FL 34744

Re:   **NOTICE OF TERMINATION** of the License Agreement dated September 28, 2006, (the "Agreement") between Akshay Hotels, Inc., ("you" or "your") and Ramada Worldwide Inc., ("we", "our" or "us") for the Ramada® System Unit #18310-68093-1 located in Kissimmee, FL (the "Facility")

Dear Mr. Callahan:

We write to give you formal notice of the termination of the License granted under the Agreement to operate the Facility as part of the Ramada System (the "Notice"). This termination is a result of your failure to cure your default under the Agreement, due to your failure to satisfy the required quality standards. The termination of your Agreement is effective as of the date of this Notice (the "Termination Date").

Because the Agreement has terminated, you must perform your post-termination obligations such as the removal of all items that display or refer to the Ramada brand at the Facility. The de-identification procedures are specified in the attachment to this Notice. These de-identification procedures must be completed within ten (10) days from the Termination Date.

You must also pay us the full amount of all Recurring Fees and other charges due under the Agreement through the date you complete the de-identification process. We estimate that, as of Termination Date, you owe us $24,257.51 in Recurring Fees. This amount is described in more detail in the attached itemized statement. Additionally, you must pay us Liquidated Damages of $146,000.00 as specified in Section 18.4 of the Agreement.   You must also pay de-commission fees of $326.00 for the termination of the Satellite Connectivity Services Addendum(the "Addendum"). The Addendum has also terminated on the Termination Date.

Please know that, because the Agreement has terminated, you also have lost the right to continue to use the seamless interface version of your property management system. You must make arrangements with the software vendor for a new license to use the property management system. If the Facility has WynGuest system installed, please be advised that due to the termination you will have no functionality from the system. Should you wish to continue using an independent version of the software, please contact Sabre at 877-520-3646. If your property is planning to migrate to another property management system, please contact your provider to expedite the installation. If you would like to inquire about the data maintained in the system, please contact Hotel Technology Client Support at 506-646-2521 to obtain reporting of that data.

# WYNDHAM
## HOTEL GROUP

















Mr. James Callahan
December 31, 2013
Page Two

If within the ten (10) day period described above, you do not timely remove the exterior signage which bears the Ramada name and Marks, we may exercise our rights under the Agreement and send an independent contractor to the Facility to remove all such signage at and around the Facility. The cost of sign removal will be added to your final invoice from us. If you object to the removal of the signage by our independent contractor, you must notify us within ten (10) days of the Termination Date.

If you do not timely complete each of these post-termination obligations, we will refer this matter to our legal department to ensure that we recover from you all amounts owed and that all of your post-termination obligations to us are performed.

This Notice does not modify, replace or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to your Guarantors.

If you have any questions regarding your obligations under this Notice, please contact Charlene Martin, Senior Manager of Settlements, at (973) 753-7602.

Sincerely,

Suzanne Fenimore
Senior Director
Contracts Compliance

Enclosures

cc:   Khalil Nanitalwala (Guarantor)
      Shahzad Haque (Guarantor)
      Caryl Porter
      Larry Geer
      Charlene Martin
      Joe Maida
      Michael Piccola

Page 1 of 5

Report Date : 31-DEC-13

ITEMIZED STATEMENT
-------------------

```
As of Date (DD-MMM-YYYY):  31-DEC-2013
Customer No               :  18310-68093-01-RAM
Category Set              :
Category Group            :
Group No                  :
Bankruptcy                :  No Bankruptcy Sites
Disputed                  :  No
Finance Charges Included:  Yes
```

Page 1 of 4

Report Date : 31-DEC-13

ITEMIZED STATEMENT
-------------------

```
Customer No :  18310-68093-01-RAM
Address :       2145 E. Irlo Bronson Memorial Hwy,KISSIMMEE,FL,34744,US
As of Date:     31-DEC-2013
```

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
| MAY-2013 | 42546031 | 31-MAY-13 | Actual-1000A-RO | | 951.72 | 0.00 | 79.95 | 1031.67 |
| | 42548846 | 31-MAY-13 | Actual-1230A-RI | | 1070.68 | 0.00 | 89.95 | 1160.63 |
| | | | | Sub Total | 2022.40 | 0.00 | 169.90 | 2192.30 |
| JUN-2013 | 42577899 | 30-JUN-13 | Actual-1230A-RI | | 1662.21 | 0.00 | 114.68 | 1776.89 |

https://oracle.wyndhamworldwide.com:8005/OA_CGI/FNDWRR.exe?temp_id=3028254063                12/31/2013

Page 2 of 5

|  | 42577898 | 30-JUN-13 | Actual-1000A-RO | 1477.52 | 0.00 | 101.94 | 1579.46 |
|---|---|---|---|---|---|---|---|
|  |  |  | Sub Total | 3139.73 | 0.00 | 216.62 | 3356.35 |
| JUL-2013 | 42609206 | 31-JUL-13 | Actual-1000A-RO | 861.28 | 0.00 | 46.08 | 907.36 |
|  | 42609207 | 31-JUL-13 | Actual-1230A-RI | 968.94 | 0.00 | 51.83 | 1020.77 |
|  |  |  | Sub Total | 1830.22 | 0.00 | 97.91 | 1928.13 |
| AUG-2013 | 25081009 | 22-AUG-13 | WYNREWARDS 5% | 229.61 | 0.00 | 9.76 | 239.37 |
|  | 30828687 | 22-AUG-13 | CIT Payoff | 1644.75 | 0.00 | 69.90 | 1714.65 |
|  | 42623345 | 31-AUG-13 | 5715A-HughesNet | 160.00 | 11.20 | 6.50 | 177.70 |
|  | 42635164 | 31-AUG-13 | Actual-1230A-RI | 411.25 | 0.00 | 15.62 | 426.87 |
|  | 42635163 | 31-AUG-13 | Actual-1000A-RO | 365.56 | 0.00 | 13.89 | 379.45 |
|  |  |  | Sub Total | 2811.17 | 11.20 | 115.67 | 2938.04 |
| SEP-2013 | 30834812 | 10-SEP-13 | 2014 Ramada RNA | 2190.00 | 0.00 | 0.00 | 2190.00 |
|  | 30835028 | 11-SEP-13 | Q/A REINSPECTIO | 1900.00 | 0.00 | 61.75 | 1961.75 |
|  | 10702985 | 26-SEP-13 | GUEST SRVCS TRA | 160.00 | 0.00 | 4.00 | 164.00 |
|  | 42650967 | 30-SEP-13 | 5715A-HughesNet | 160.00 | 11.20 | 3.94 | 175.14 |
|  | 42665683 | 30-SEP-13 | Actual-1230A-RI | 148.68 | 0.00 | 3.42 | 152.10 |
|  | 42665682 | 30-SEP-13 | Actual-1000A-RO | 132.16 | 0.00 | 3.04 | 135.20 |

Page 2 of 4

Report Date : 31-DEC-13

ITEMIZED STATEMENT
------------------------

Customer No :   18310-68093-01-RAM
Address :       2145 E. Irlo Bronson Memorial Hwy,KISSIMMEE,FL,34744,US
As of Date:     31-DEC-2013

Page 3 of 5

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
| | | | | Sub Total | 4690.84 | 11.20 | 76.15 | 4778.19 |
| OCT-2013 | 42696188 | 31-OCT-13 | Accrual-1230A-R | * | 308.39 | 0.00 | 2.31 | 310.70 |
| | 42696125 | 31-OCT-13 | Accrual-1000A-R | * | 274.12 | 0.00 | 2.06 | 276.18 |
| | 42674515 | 31-OCT-13 | 5715A-HughesNet | | 160.00 | 11.20 | 1.28 | 172.48 |
| | | | | Sub Total | 742.51 | 11.20 | 5.65 | 759.36 |
| NOV-2013 | 30853655 | 07-NOV-13 | Q/A REINSPECTIO | | 1900.00 | 0.00 | 7.60 | 1907.60 |
| | 10711103 | 14-NOV-13 | GUEST SRVCS TRA | | 160.00 | 0.00 | 0.08 | 160.08 |
| | 10710343 | 14-NOV-13 | GUEST SATISFACT | | 52.00 | 0.00 | 0.03 | 52.03 |
| | 10711588 | 18-NOV-13 | GUEST SATISFACT | | (52.00) | 0.00 | 0.00 | (52.00) |
| | 10711699 | 20-NOV-13 | GUEST SRVCS TRA | | (160.00) | 0.00 | 0.00 | (160.00) |
| | TC0424587 | 21-NOV-13 | T/A COMM SERVIC | | 2.97 | 0.00 | 0.00 | 2.97 |
| | TA0424587 | 21-NOV-13 | T/A COMMISSIONS | | 15.86 | 0.00 | 0.00 | 15.86 |
| | 1424587 | 21-NOV-13 | GDS & INTERNET | | 78.70 | 0.00 | 0.00 | 78.70 |
| | TM0424587 | 21-NOV-13 | MEMBER BENEFIT | | 22.03 | 0.00 | 0.00 | 22.03 |
| | 29006048 | 22-NOV-13 | RES CENTRAL(CAL | | 50.00 | 0.00 | 0.00 | 50.00 |
| | 25083949 | 22-NOV-13 | WYNREWARDS CRDT | | (75.00) | 0.00 | 0.00 | (75.00) |
| | 30857569 | 22-NOV-13 | WYNREWARDS ADJ | | 25.00 | 0.00 | 0.00 | 25.00 |
| | 25083979 | 22-NOV-13 | WYNREWARDS 5% | | 21.90 | 0.00 | 0.00 | 21.90 |
| | 30864776 | 30-NOV-13 | Q/A REINSPECTIO | | 1900.00 | 0.00 | 0.00 | 1900.00 |
| | 42700100 | 30-NOV-13 | 5715A-HughesNet | | 160.00 | 11.20 | 0.00 | 171.20 |
| | 42725366 | 30-NOV-13 | Accrual-1000A-R | * | 1669.32 | 0.00 | 0.00 | 1669.32 |
| | 42725367 | 30-NOV-13 | Accrual-1230A-R | * | 1877.99 | 0.00 | 0.00 | 1877.99 |
| | | | | Sub Total | 7648.77 | 11.20 | 7.71 | 7667.68 |
| DEC-2013 | 10714694 | 18-DEC-13 | GUEST SATISFACT | | 25.00 | 0.00 | 0.00 | 25.00 |
| | 10714576 | 18-DEC-13 | GUEST SRVCS TRA | | 160.00 | 0.00 | 0.00 | 160.00 |
| | 25085445 | 22-DEC-13 | WYNREWARDS 5% | | 58.25 | 0.00 | 0.00 | 58.25 |
| | 25084880 | 22-DEC-13 | WYNREWARDS CRDT | | (25.00) | 0.00 | 0.00 | (25.00) |

Page 3 of 4

Report Date : 31-DEC-13

### ITEMIZED STATEMENT
-----------------------

Customer No : 18310-68093-01-RAM
Address :     2145 E. Irlo Bronson Memorial Hwy,KISSIMMEE,FL,34744,US
As of Date:   31-DEC-2013

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
|  | 29006178 | 22-DEC-13 | RES CENTRAL(CAL |  | 50.00 | 0.00 | 0.00 | 50.00 |
|  | 10715722 | 25-DEC-13 | GUEST SATISFACT |  | 90.80 | 0.00 | 0.00 | 90.80 |
|  | 10715446 | 25-DEC-13 | GUEST SRVCS TRA |  | (160.00) | 0.00 | 0.00 | (160.00) |
|  | 10715508 | 25-DEC-13 | GUEST SRVCS TRA |  | 160.00 | 0.00 | 0.00 | 160.00 |
|  | TA0431431 | 27-DEC-13 | T/A COMMISSIONS |  | 11.39 | 0.00 | 0.00 | 11.39 |
|  | 1431431 | 27-DEC-13 | GDS & INTERNET |  | 33.30 | 0.00 | 0.00 | 33.30 |
|  | TC0431431 | 27-DEC-13 | T/A COMM SERVIC |  | 5.14 | 0.00 | 0.00 | 5.14 |
|  | TM0431431 | 27-DEC-13 | MEMBER BENEFIT |  | 57.38 | 0.00 | 0.00 | 57.38 |
|  | 42730674 | 31-DEC-13 | 5715A-HughesNet |  | 160.00 | 11.20 | 0.00 | 171.20 |
|  |  |  | Sub Total |  | 626.26 | 11.20 | 0.00 | 637.46 |
|  |  |  | Grand Total |  | 23511.90 | 56.00 | 689.61 | 24257.51 |

Requested By: Yelena Danishevsky

* Please note the accruals on your account are estimates.
  Make sure to promptly submit your actual gross room revenue and rooms sold.

******* END OF REPORT *******

Page 5 of 5

Page 4 of 4

# DE-IDENTIFICATION PROCEDURES

**You must complete each of the following within 10 days after the Termination Date:**

1.  Remove, replace or cover with an opaque cover the primary Facility signage.

2.  Remove all interior signage that contains Ramada Marks.

3.  Change advertising billboards to remove Ramada Marks.

4.  Stop answering Facility telephone as Ramada guest lodging facility.

5.  Remove Ramada name and Marks from any domain name, advertising and brochures.

6.  Return to us all confidential operations and training manuals.

7.  Remove the Ramada name and Marks from the following items:

> Stationery, pads and pens
> Directories and brochures
> Business cards
> Folios and registration cards
> Do-not-disturb cards
> Comment cards
> Telephone plates
> Telephone dialing instructions
> TV channel ID plates
> Rate/law cards
> Door signage
> Soap/shampoo
> Key tags
> Credit card imprinter
> Laundry bags
> Name tags/uniforms
> Ice buckets/trays
> Ashtrays/matches
> Plaques
> Guest checks/receipts
> Menus

8.  Paint over or remove any distinctive Ramada trade dress, paint schemes or architectural features.

9.  It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Ramada facility.

10. Our quality assurance inspectors will visit the Facility at any time after 10 days after the Termination Date to verify that you have performed these de-identification obligations.

UPS CampusShip: Shipment Receipt                                    Page 1 of 1

 **Shipment Receipt**

**Transaction Date: 26 Dec 2013**          **Tracking Number:**      1Z22445X0197697369

| **1** | **Address Information** |

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Akshay Hotels, Inc. | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| James Callahan | Elena Danishevsky | Elena Danishevsky |
| Ramada | 22 Sylvan Way | 22 Sylvan Way |
| 2145 E. Irlo Bronson Memorial Highw | Parsippany NJ 07054 | Parsippany NJ 07054 |
| KISSIMMEE FL 347444417 | Telephone:973-753-7236 | Telephone:973-753-7236 |
| Telephone:(407) 846-4846 | | |

| **2** | **Package Information** |

| | Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|---|
| 1. | Letter | UPS Letter | | Reference # 1 - 006-1696 |
| | | | | Reference # 2 - |
| | | | | Reference # 3 - |

| **3** | **UPS Shipping Service and Shipping Options** |

| Service: | UPS Next Day Air |
|---|---|
| Guaranteed By: | 10:30 AM Friday, Dec 27, 2013 |
| Shipping Fees Subtotal: | 31.82 USD |
| Transportation | 28.80 USD |
| Fuel Surcharge | 3.02 USD |

| **4** | **Payment Information** |

Bill Shipping Charges to:          Shipper's Account 22445X

**A discount has been applied to the Daily rates for this shipment**

| Total Charged: | 31.82 USD |
|---|---|
| Negotiated Total: | 8.74 USD |

Note: Your invoice may vary from the displayed reference rates.
* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

# EXHIBIT G



May 8, 2015

*VIA CERTIFIED & REGULAR MAIL*

Akshay Hotels, Inc.
Khalil Nanitalwala
Shahzad Haque
2145 East Irlo Bronson Memorial Highway
Kissimmee, Florida 34744

**Re:    Demand to Cease and Desist Ongoing Infringement of Ramada Worldwide Inc.'s Trade Name and Service Marks at Facility located at 2145 East Irlo Bronson Memorial Highway, Kissimmee, Florida 34744, Former Ramada® Site No. 18310-68093-01**

Dear Sir/Madam:

We represent Ramada Worldwide Inc. ("RWI") relative to issues relating to the guest lodging facility located at 2145 East Irlo Bronson Memorial Highway, Kissimmee, Florida 34744 (the "Facility") and operating as a Ramada® facility. We write to demand that you cease and desist from using the Ramada® trade name, trademarks or service marks (collectively, the "Ramada® Marks"), and/or names and marks that are confusingly similar to the Ramada® Marks.

The License Agreement between Akshay Hotels, Inc. and RWI terminated effective December 31, 2013. Thus, the Facility is no longer authorized to operate as a Ramada®. Pursuant to the License Agreement, the Facility was required to immediately cease using all of the Ramada® Marks. Since the termination of the License Agreement, the Facility has used the Ramada® Marks without authorization to rent rooms through, among other things, failure to remove the Ramada® signage and continuing to utilize the Ramada® Marks throughout the Facility. Specifically, by way of example and not limitation, signage bearing the Ramada® Marks is located at the Facility and in the Facility's public areas, all within view of the traveling public.

As you know, RWI is one of the largest guest lodging facility franchise systems in the United States, and is widely known as a provider of guest lodging facility services. RWI owns and has the exclusive right to license the use of the Ramada® Marks, as well as the distinctive Ramada® System, which provides hotel services to the public under the Ramada® name and

E-mail: Bryan.Couch@leclairryan.com
Direct Phone: (973) 491-3582
Direct Fax: (973) 491-3632

1037 Raymond Boulevard, Sixteenth Floor
Newark, New Jersey 07102
Phone: 973.491.3600 | Fax: 973.491.3555

CALIFORNIA \ COLORADO \ CONNECTICUT \ MARYLAND \ MASSACHUSETTS \ MICHIGAN \ NEW JERSEY \ NEW YORK \ PENNSYLVANIA \ VIRGINIA \ WASHINGTON, D.C.

ATTORNEYS AT LAW \ WWW.LECLAIRRYAN.COM

Akshay Hotels, Inc.
Khalil Nanitalwala
Shahzad Haque
May 8, 2015
Page 2

certain services to its licensees, including a centralized reservation system, advertising, publicity, and training services.  RWI or its predecessors have continuously used each of the Ramada® Marks since the date of their registration and these marks are in full force and effect pursuant to 15 U.S.C. § 1065.

RWI prides itself on the quality of its services, and its reputation for quality, and the very substantial good will that has become attributable to it.  RWI has spent substantial sums in development, and promotion of the good will associated with the Ramada® Marks and views them as substantial proprietary assets.  The value of RWI's good will exceeds hundreds of millions of dollars.

The Facility's continued use of the Ramada® Marks constitutes an infringement of RWI's rights.  This infringement is: 1) causing confusion among the public as to the affiliation of the Facility with the Ramada® System; and 2) damaging contractual relations between RWI and its legitimate licensees.  This has caused dilution and disparagement of the distinctive quality of the Ramada® Marks, and lessened the capacity of the Ramada® Marks to identify and distinguish the goods and services of RWI, all in violation of Section 43(c) of the Lanham Act.

Please be advised that if the Facility does not cease and desist from (1) using all Ramada® Marks; (2) displaying signage confusingly similar to the Ramada® Marks; and (3) otherwise identifying the Facility as a Ramada® by the close of business on Friday, May 22, 2015, RWI will immediately move for injunctive relief and seek to recover damages which, under the Lanham Act, may include an award of treble damages and attorneys' fees.  See 15 U.S.C. § 1114, et seq.

Finally, Akshay Hotels, Inc. has also failed to satisfy its financial obligations to RWI.  Liquidated damages in the amount $146,000.00 and outstanding Recurring Fees, which now total $29,437.90, remain due and owing under the License Agreement.  Akshay Hotels, Inc. is responsible for the payment of the past due amounts.  Khalil Nanitalwala and Shahzad Haque are also responsible for payment of these amounts as personal guarantors of Akshay Hotel, Inc.'s obligations under the License Agreement.

We are hopeful that we can reach an amicable resolution to the current problem.  However, while RWI generally is desirous of avoiding litigation, it will vigorously enforce its proprietary rights where it believes that infringement is occurring and that litigation cannot otherwise be avoided.  **This letter will be our sole attempt to resolve this matter prior to the institution of legal proceedings seeking all available relief on behalf of our client.**

The foregoing is not intended, nor shall it be construed, as a complete recitation of the facts and events concerning the above-referenced matter or the law or claims of RWI in the event

Akshay Hotels, Inc.
Khalil Nanitalwala
Shahzad Haque
May 8, 2015
Page 3

filings with respect thereto, nor shall it be construed as a complete recitation of any of your rights, claims, damages or remedies, legal or equitable.  Nothing hereinabove stated or omitted shall be deemed a waiver or limitation of any right, remedy, claim, or cause of action of any kind whatsoever, all of which are hereby expressly reserved.  This letter is written without prejudice to any claims which RWI may have against you and/or related entities, including but not limited to injunctive relief and money damages, should action against you prove necessary.

    Please do not hesitate to contact me if you have any questions about this matter.

                                        Very truly yours,

                                        Bryan P. Couch
                                        Attorney at Law

BPC/JMV/vs